No. 2067

Second Circuit Appeal

PATRICK H. CONNELL v. UNITED STATES SHEET & WINDOW GLASS CO.

(April 11, 1925, Opinion and Decree)

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Master and Servant—Par. 159.**

Under Employers' Liability Act No. 20 of 1914, where injured employee had a severe case of Bright's disease when the accident occurred, he can recover compensation even though the accident accelerated the disease and both together created the disability. The effect of the accident and those of the disease cannot be separated.

2. **Louisiana Digest—Master and Servant—Par. 154.**

Under Sections 11 and 15 of Act No. 20 of 1914, the Employers' Liability Act, the fact that the gate watchman of the employer and another employee were notified of the accident at the time of the accident or death is sufficient notice to the employer to enable the injured employee to bring suit.

3. **Louisiana Digest—Master and Servant—Par. 154.**

Under Section 12 of Employers' Liability Act No. 20 of 1914, where it is not shown that the notice required therein was posted by the defendant nor that any prejudice has been suffered to defendant by want of notice of the accident, the notification to the night watchman and another employer at the time of the accident is sufficient.

4. **Louisiana Digest—Master and Servant—Par. 160 (k).**

Section 22 of the Employers' Liability Act No. 20 of 1914 contemplates that services of attorneys and physicians may be secured out of the amount collected as compensation, and therefore such fees are excepted from the prohibition against assignment. The requirement that the fees shall be reasonable and approved by the court protects the injured employee.

5. **Louisiana Digest—Master and Servant—Par. 160 (k).**

An attorney's fee of one-third the compensation recovered is reasonable.

6. **Louisiana Digest—Master and Servant—Par. 154.**

Under Subsection 4 of Section 8, as amended by Act 43 of 1922, where disability continues six weeks or longer, then after six weeks have elapsed compensation for the first week shall be allowed.

7. **Louisiana Digest—Master and Servant—Par. 160 (i).**

Where the heirs of an injured employee have made themselves parties but the widow has not, although she has a right so to do, under Subsection 4 of Section 18 of Employers' Liability Act No. 20 of 1914, the court reserves the rights of the widow to make herself a party to the suit if she so desires.

Appeal from First Judicial District Court of Louisiana, Parish of Caddo. Hon. E. P. Mills, Judge.

This is a suit for compensation under Employers' Liability Act No. 20 of 1914.

There was judgment for plaintiff and plaintiff appealed.

Judgment increased and affirmed.

Julius T. Long, of Shreveport, attorney for plaintiff, appellant.

Wilkinson, Lewis & Wilkinson, of Shreveport, attorneys for defendant, appellee.

CARVER, J. Plaintiff sues for compensation under the Workmen's Compensation Law for injuries received when he accidentally fell down a flight of steps at defendant's glass factory while performing his duties as nightwatchman. He claims $250.00 for medical attention and nursing, $18.00 a week for 100 weeks for loss of his teeth, and $18.00 a week for 400 weeks

for total disability to do work of any reasonable character.

Defendant answered that for a long time prior to the accident plaintiff had suffered from high blood pressure, uraemic poison and other troubles and diseases that his present condition is not and was not caused by any injury arising out of or in the course of his employment or sustained while employed by defendant.

There is no dispute as to plaintiff's falling down the stairs nor as to his condition at the time of the trial being one of disability, though defendant denies that it was total.

It is established that, prior to the fall, plaintiff had high blood pressure, pyorrhea and kidney trouble and had at times dragged his leg. The main dispute is as to whether his disability was produced by the fall or by his previous ill health.

Plaintiff's counsel claim that if the disability is due to his prior condition of ill health that condition was at least aggravated by the fall and that this is sufficient ground for a recovery.

Plaintiff was 52 years old and had been working for defendant about a year and a half before the accident, which occurred at midnight on February 9, 1923. Before entering defendant's employment he was seemingly in good health. Dr. Tucker says, page 32, he saw him practically every week the year before that; that he worked on public road work that year, which was very hard work; that for about four years before that plaintiff was super intendent on a farm; that he practiced in his family but never had occasion to give plaintiff, himself, any medicine, and (page 38) that he had the appearance of a strong, healthy man, but that he had made no examination of him at that time

Planitiff had chills and dengue fever while working for defendant, the time not being very definitely fixed. This kept him in bed two weeks or longer (page 6). He admits he consulted Doctor Woolworth of Keithville and Doctor Cannon of Shreveport about his kidneys, and that they sometimes hurt him, but never for more than a little while at a time. The consultation with Doctor Woolworth was perhaps before he went to work for defendant.

Besides the dengue fever and kidney trouble he had on two or more occasions something the matter with his right leg which caused him to drag it. He says it was due once to his having to throw most of his weight on that leg while drilling holes in the wall for fitting pipes (page 16) but that the trouble lasted then only two or three days. He says (page 29) that on another occasion he had boils on both legs and could not walk straight while he had them. He denies that he was ever laid off for sickness by defendant but admits that he stayed away two days when his foot bothered him, and says this was six or seven months before the accident (page 17). The boil trouble, he says, was in 1921 and lasted three or four days.

His son, B. M. Connell, says he did not see him often the three or four years before he began working for defendant but saw him once or twice a week snce, and that he knew of no sickness he had during that time except the "flu", probably meaning the attack of dengue.

M. A. Wilson, who, for ten months or so before the accident, had regularly visited plaintiff's home three to five times a week, says he saw nothing the matter with him and did not know of his high blood pressure, kidney trouble or pyorrhea.

J. S. Thompson, who began working for defendant in July, 1921, and has known plaintiff since that time, in speaking of plaintiff's condition prior to the accident, says (page 53):

"Mr. Connell had been sick and laid off or something on account of being sick and

came back on the 20th of January when he was dragging his right leg coming up the walk to the gate where I sat."

This was about twenty days before the accident.

After considerable testimony as to other occasions on which he said the plaintiff was sick and dragged his leg, he testified, page (58):

"Q. And he came up there dragging his leg?
"A. Yes, on January 20th.
"Q. How long did he drag his leg?
"A. He got up there and left ——
"Q. You saw him drag it before that time?
"A. Yes, he got in that fix before.
"Q. When?
"A. Some time in the fall, but I couldn't state the exact date.
"Q. It might have been in October?
"A. Yes, it might have been.
"Q. How long did he drag it then?
"A. I couldn't say.
"Q. Are these the only two times you saw him dragging it?
"A. Yes, only two times I am positive about.
"Q. You saw him on January 20th and he was dragging it?
"A. Yes.
"Q. And you never saw him dragging it any more?
"A. No, after he went back to work he seemed to be all right.
"Q. You never saw anything wrong after that?
"A. No, sir."

Thompson also says (page 54) that plaintiff always talked a little bad ever since he knew him.

J. E. Hillier, under whom plaintiff had worked, testified (page 62) that the first time plaintiff got sick was in the summer of 1922 when he stayed home a few days and said the doctor pronounced his trouble high blood pressure; that he came back and worked until cool weather, when he came out one morning dragging his foot and said his knee hurt him; that he

worked in the cold until 10 or 11 o'clock when he had to go home and came back Tuesday of the next week; that they then had to work in a mud hole all day, when plaintiff went home and had dengue fever, and when he came back he didn't seem like the same man any more; that he met him on the road after that and he looked bad and his leg was stiff and dragging (page 63).

On cross-exaination he testified (page 64) that after the summer attack plaintiff came back and did hard manual labor as before; and further, (page 65):

"Q. I believe you stated in October he came back sort of dragging his foot?
"A. No, he worked a right smart little while and he went home and came back dragging his leg."

He further says he did not think plaintiff had risings on his leg as he was intimate with plaintiff and he would likely have mentioned it.

Plaintiff worked at the pipe job until it was finished and was then laid off for a while but not on account of sickness and was afterwards employed as nightwatchman (page 67).

Hillier also testified, further (page 68), that Connell was a hard worker, and that the job of nightwatching was a hard one, requiring a pretty strong and sound man, though a crippled man could do it tolerably well.

Hillier was not asked as to whether plaintiff's speech was defective before the accident or not.

Plaintiff says (page 98) that Thompson is mistaken about his dragging his leg in January; that this occurred in the fall, and that he had no trouble with his leg in January.

We are not informed whether defendant kept its records in a way that would enable it to prove how often or for what

length of time plaintiff had been laid off on account of sickness; it seems, though, that if either his speech or his leg had been affected seriously or for any considerable length of time, it easily could have been proven by plaintiff's fellow workmen.

Our conclusion from the evidence is that while his health had been impaired to some extent by the dengue fever, and while the kidney disease had made some progress, yet it had not made such inroads on his constitution as to incapacitate him from performing his duties as nightwatchman. There is no pretense that he did not perform them satisfactorily, even after the 20th of January when Thompson says he was dragging his leg, and up to 12 o'clock on the night of the accident, at which time he had punched twelve clocks six times, the clocks being something over two hundred feet apart.

Plaintiff says he stumbled, missed the banisters and somersaulted down the stairway, landing on the bottom step but one; that he got up in about ten minutes, went downstairs and walked across the railroad into and through a box car, the floor of which was level with the ground; that he tried to jump to the level ground on the other side, missed and fell on his shoulder; that he lay there longer than after the first fall; that he then started to the box factory and ran into a pile of steel; that he got to the box factory but found no one there and then went to the office where he found the gate watchman who sent him home in an automobile. On arriving at home he lapsed into a semicomatose condition which lasted about two weeks.

Doctor Harmon was called in and says he was in an unconscious condition and had some scratches on his face and both legs about half-way between the knee and the foot; that he did not make further examination that night but did next morning and found he had high blood pressure and pyorrhea; that he diagnosed the case as uraemic poisoning and treated him for that; he did not think the fall had much to do with plaintiff's condition at that time (page 86); and that, but for other complications, plaintiff should have been able to resume work in twelve or fifteen days. He had plaintiff's teeth pulled, thinking that would remove a source of infection and relieve the kidney trouble. He thought he was partially paralyzed, having less strength in his right arm than in his left.

Doctor Tucker visited plaintiff the next two days after the accident but finding Doctor Harmon in charge did not go into his physical condition to any extent. He did not think there was any paralysis, though he found plaintiff unconscious.

Doctor Gorton (page 89) saw plaintiff once while he was unconscious, consulting with Doctor Harmon, with whose opinion as to Bright's disease and uraemic poisoning he agreed. He was not asked as to paralysis.

At some time after regaining consciousness, the time not being very definitely fixed, plaintiff resumed his job as nightwatchman, but says (page 27) he only worked ten days when he got sick and when he went back defendant laid him off, and that he was not able to do the work because his leg would not stand it. He says (page 12) that he got a job for a month or two as nightwatchman for M. & A. Company, Texas avenue, at $20.00 per week (page 13), remained with them from July 6th until October 3rd, 1923, but with intermissions on account of sickness.

The trial was had October 9, 1923, and we are informed the plaintiff died May 19, 1924.

At the time of the trial plaintiff was found to have very high blood pressure, 218 high and 140 low once, and 238 high

and 163 low once, whereas it should have been 140 and 90. His urine showed much albumen and many casts, denoting kidney disease of long standing. His speech was indistinct and his right leg somewhat smaller and weaker than the left, and he was to some extent paralyzed.

Five physicians testified as to the cause of his condition then and also as to the cause of the attack he had just after the fall. Four of these, Walke (page 72), Harmon (page 80)), Gorton (page 90) and Cassity (page 95) say the fall could not have produced uraemic coma. Tucker was not specifically asked as to this.

As to his condition at the time of the trial, none of the physicians thought it due solely to the fall and all thought his kidney trouble responsible for it, some more and some less; but most of them thought the fall aggravated or accentuated it. Tucker says (page 34):

"Q. Then, you give it as your opinion that if this fall isn't entirely responsible for his trouble it might, with all probability, have accentuated it?
"A. Yes, sir.
"Q. And made it in the state it is today?
"A. Yes, sir."

Gorton says (page 91):

"Q. Has that fall that he claims to have had, has that anything to do with his present condition of health?
"A. No, I do not think so."

Further (page 92):

"Q. Doctor, if he stumbled and fell, and was in bad condition, it would be calculated to make it worse and today you would say that his condition, if he took such a fall as that, would be worse than it would have been if he had not fallen?
"A. Yes, sir; a fall would have made the condition worse."

Cassity (page 94) says:

"Well, such a fall as that would aggravate most any disability or disease that

a man might have; there would naturally be a severe shock in a fall of that kind, to say the least of it."

And further (page 97):

"Q. Supposing that this man had that kind of thing, assuming that he had such a shock, such as produced by falling down a stairway, then is it reasonably probable that that shock, this injury aggravated and increased the extent of his injuries?
"A. Undoubtedly it would."

Doctor Harman says (page 84):

"Q. Would you say the probabilities are it did do him harm? We will say he was already in this condition but was able to do strenuous walking, the kind of work a crippled man couldn't do, would you say that kind of fall down a forty-foot flight of steps rolling and tumbling, that that fall didn't probably increase and aggravate the injuries which he already had?
"A. I couldn't say it didn't.
"Q. Don't you think it would?
"A. It is possible it might aggravate it, yes."

Doctor Walke (page 72):

"Q. Was there anything in the history of his case and the condition as you found it to show that the fall might have caused that present condition?
"A. No, sir."

He was not asked the direct question whether the fall could have aggravated the kidney trouble.

Continuing, he testifies:

"Q. I will ask you from the facts you have heard stated from the plaintiff himself and from other testimony, what, in your opinion, is the cause of plaintiff's condition today?
"A. He has had either a mild stroke of apoplexy or urinic trochar from the kidney, that is the two together. This is often the danger with arteriosclerosis, they go together. We often find the three together. The blood pressure and urinic condition of the kidneys."

He further says (page 71) that a man with high blood pressure and kidney trou-

ble has not got a normal sense of balance and is likely to stumble and fall, and also that dragging the leg is a symptom of high blood pressure and kidney trouble (page 78).

Doctor Harmon says (page 84) that plaintiff had a cerebral hemorrhage producing slight paralysis, but was uncertain what caused the hemorrhage, saying (85) that he might have it with normal pressure but that the fall was more likely to bring it on.

Doctor Gorton says (page 91), a fall such as plaintiff had might bring on paralysis but that the fall might be caused by the kidney condition rather than the kidney condition be caused by the fall.

Doctor Cassity says (page 95), the fall would have reasonably accounted for the cerebral hemorrhage which would · result in paralysis of one or more limbs.

He says, further, (page 95:

"Q. Now, taking it · for granted that this man was a man that was able to do hard work, walk, such work that a . disabled man could not do, as proven in this case, would it be more probable that he received that cerebral hemorrhage in that fall than it was that he just toppled over?

"A. Well, in all probability, it would be hard to make an accurate statement along that line; the man had very high blood pressure at the time of his injury, or just preceding his injury; of course, he could have had cerebral hemorrhage without having any accident in the world, but I think perhaps that most of us would figure, perhaps, if the man was going along and working, and so far as we knew carrying out his duties, as he was supposed to do, then suddenly have a fall down stairs, I believe that most of us would assume that the fall caused the cerebral hemorrhage rather than it preceded the fall, but one might precede the other."

In Hicks vs. Meridian Lumber Co., 152 La. 975, 91 South. 903, the court says:

"It is quite immaterial for the purposes of this case whether the alleged strain brought on the aneurism, or merely hastened the inevitable rupture; for this court would allow compensation in either case.

"In Craft vs. Lumber Co., 151 La. 281, 285, 91 South. 736, 737, we allowed compensation although we were 'strongly persuaded from the evidence that at the time the plaintiff received the blow in the lower part of the abdomen he had a hernia in process of development, which was quickened and greatly accelerated by the blow he received.'"

In Hooper vs. Standard Ins. Co., 166 Mo. App. 209, 148 S. W. 116:

"Where a man is so afflicted that he will dies from such affliction within a very short time, yet, if by some accidental means his death is caused sooner, it will be a death from 'accident' within the meaning of * * * an accident insurance policy."

In Carter Packet Co. vs. Reinhardt, 13 Orleans Appeal 462, it was held that:

"Where the accident was the immediate cause of death, it is immaterial under the (Workmen's Compensation) Act whether or not the employee be or be not peculiarly subject to have such accident befall him or to suffer therefrom more than another differently situated; the sole question being whether the accident was the immediate cause of the injury."

And there can be no doubt that such is the law. Thus:

"In Behan vs. Honor Co., 143 La. 348 78 South. 589, L. R. A. 1918F. 862, this court held that:

"The fact that an employee, injured in performing services arising out of and incidental to his employment in the course of his employer's occupation, was already afflicted with a dormant disease that might some day have produced physical disability is no reason why the employee should not be allowed compensation under the employers' liability statute, for the injury which, added to the disease, superinduced physical disability."

See, also, Fox vs. U. S. Chemical, etc. Co., 147 La. 866, 86 South. 311.

Counsel for defendant say in their brief:

"The basis of the defense in this case is that the injury did not arise OUT OF the employment."

"An excellent discussion of this very question will be found in the case of Myers vs. L. R. & N. Co., 140 La. 937, 74 South. 256. On page 941 of the cited case the Supreme Court quotes approvingly the following extracts from the decisions of other courts on statutes exactly like ours.

"It is sufficient to say that an injury is received 'in the course of the employment' when it comes while the workman is doing the duty which he is employed to perform. It arises 'out of' the employment, when there is apparent to the rational mind upon consideration of all the circumstances, a casual connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment. * * * but it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workman would have been equally exposed apart from the employment. The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence."

* * *

"The words, 'out of,' point to the origin or cause of the accident; the words, 'in the course of,' to the time, place and circumstances under which the accident takes place. The former words are descriptive of the character or quality of the accident. The latter words relate to the circumstances under which an accident of that character or quality takes place. The character or quality of the accident as conveyed by the words, 'out of,' involves the idea that the accident is in some sense due to the employment. It must be an accident resulting from a risk reasonably incident to the employment."

In L. R. A. 1918F, page 903, cases are referred to which are similar in point to the case at bar:

"A fall resulting from a man's mental condition arises out of the condition, and not out of the employment." Peterson vs. Industrial Bd. (1917), 281, 111, 326; 117 N. E. 1033.

"So if the fall of an employee was not due to the employment, but was caused by her own physical or mental condition, or was brought about by her exertions in her own affairs, or by any cause other than the employment, then there can be no recovery." Hallet's case (1918), 230 Mass. 326, 119 N. E. 673.

"An employee at work upon a proper scaffold who, solely because of his predisposition to epilepsy, fell from a scaffold, receiving an injury from which death resulted, did not suffer an injury arising out of the employment, although it arose in the course of it." Van Gorder vs. Packard Motor Car Co. (1917), 195 Mich. 588; L. R. A. 1917E, 522; 162 N. W. 107.

In the case of Brooker vs. Industrial Accident Commission, reported at page 878, L. R. A. 1918F, the court held that the death of an employee from a fall from a proper scaffold because of an epileptic seizure does not arise out of his employment within the meaning of the Workmen's Compensation Act.

Their argument involves three propositions:

1. That to entail liability the accident must result from a risk reasonably incident to the employment.

We think the accident in this case did so result. Plaintiff's duties required him to walk nearly all the time from one clock to another, and there is no pretense that his route did not pass near the stairway down which he fell. In the Myers case are given various instances of accidents held to have arisen out of the employment, amongst which are those of a sailor who fell down a hatchway while washing his clothes, and of an insurance collector who slipped on a stair while on his rounds.

2. That plaintiff's fall was caused by his diseased condition.

We do not think the proof shows this. Doctor Walke testifies that his disease made him more likely to fall than a normal man with a better sense of balance, but any man is liable to stumble and fall when walking; and in the Hicks case the court quotes the following from Carter Co. vs. Reinhardt, 13 Orleans App. 462, stating that there can be no doubt that such is the law, namely:

"Where the accident was the immediate cause of death it is immaterial under the Workmen's Compensation Act whether or not the employee be or be not peculiarly subject to have such accidents befall him or to suffer therefrom more than another differently situated; the sole question being whether the accident was the immediate cause of the injury."

In the Van Gorder and Brooker cases cited by defendant's counsel, the parties dying from the fall were not walking but sitting or standing on proper scaffolding and were accidentally seized with epileptic fits which the court found in both cases to be the sole cause of the fall.

In the Peterson case the plaintiff had a broken collar bone, but counsel for both parties agreed that the fall which he got at the factory was not sufficient to account for this injury. The court further found that it was pure conjecture whether the decedent fell from vertigo or weakness from fasting or whether he fell in the shop or at the foot of the stairs or on his way home.

In the Hallett case, a woman carrying two grips fell from the top of a short stairway, but the proof did not show what caused the fall or whether she was busy on her own concerns or her master's, and the court remanded the case to the industrial board to ascertain these facts.

3. That plaintiff's condition of disability was due to his kidney disease and not to the fall.

It is true that the evidence shows that plaintiff did have a severe case of Bright's disease, but it is held in the Hicks case and others therein cited that where an accident arising out of and in the course of the employment accelerated a disease and both together created disability, compensation is allowable.

We think the evidence here shows that plaintiff's disease was accelerated by the fall. For a considerable time before the accident and for six hours on the night of the accident he had been performing his strenuous duties without interruption and presumably in a satisfactory manner. Immediately following the fall he remained semi-comatose for about six weeks and although regaining consciousness never became as well as before and had apparently been declining ever since. Although he returned to work he was not able to continue working for long at a time, and evidently the work of nightwatchman at a factory, requiring walking, was too strenuous for him, although he could, between spells of sickness, perform the duties of watchman which permitted him to sit down all or most of the time.

It seems to us that the effects of the fall and those of the disease cannot be so separated as to enable anyone to say that here end the one and begin the other. If the medical experts spoke with confidence and were substantially agreed that this could be done, we would, of course, bow to their superior knowledge, but their testimony is not in agreement and most of them do not speak with certainty; and it seems to us more reasonable to conclude that the fall was at least in part responsible for plaintiff's condition rather than that the disease was solely responsible therefor, to the exclusion of the fall.

We do not think, though, that total disability is proven. Counsel for defendant argue that because the claim is for total disability and there is no prayer for partial disability no allowance can be made. We think, though, that the greater includes the less and that so technical a view as this would not accord with the liberality which the act enjoins in the matter of evidence and procedure.

Plaintiff was receiving $100.00 per month from defendant and subsequently received $20.00 per week from the M. & A. Company, but could not work steadily. While impossible, of course, to fix exactly the difference in earning capacity it is no more so than to fix damages in personal injury cases which, though, the court must do as best it can.

We think a difference of $50.00 per month proper in this case.

There is no proof as to the amount paid or owed by plaintiff for medical attention and nursing, but considering he was unconscious for so long, during which time, of course, he needed both medical attention and nursing, we think an allowance of $150 proper.

The demand for loss of plaintiff's teeth cannot be allowed. They were pulled out not because of the fall but because of pyorrhea.

Defendant's counsel do not specially argue the failure to give notice but state in their brief that they wish to emphasize it. It is not shown that defendant had the notice required by Section 12 of the act posted in its plant, nor is it alleged that any prejudice has been suffered by defendant by the want of notice, nor does it claim that it did not have knowledge of the accident.

See Section 15 of the act.

In view of these considerations, and because plaintiff, on the night of the accident, informed the gate watchman of it and Hillier learned of it very soon afterwards, and Doctor Gorton, who, according to some of the testimony, was probably defendant's physician, visited plaintiff while he was still unconscious, we are satisfied that defendant did have knowledge of the accident.

Furthermore, in paragraph four of its answer, defendant avers that the suit is unnecessary because it is ready, able, willing and anxious to pay plaintiff any compensation due him.

For all these reasons we think the bar provided for by Section 11 should not apply.

In plaintiff's petition he alleges that he employed the attorney in the suit on a contingent fee of one-third of the amount to be recovered, which agreement he asks the court to approve. The defendant alleges that this agreement is virtually an assignment of the claim and, as such, prohibited by Section 22 of the act, which reads as follows:

"That claims or payments due under this act shall not be assignable and shall be

exempt from all claims of creditors and from levy or execution or attachment or garnishment except under a judgment of court for alimony in favor of a wife or ascendant or descendant. Fee of attorneys and physicians for services under this act shall be reasonable and measured according to the workman's station and shall be approved by the court."

It seems to us that this section rather contemplates that the services of attorneys and physicians may be secured out of the amount collected as compensation, and therefore that such fees are excepted from the prohibition against assignment. The claimant is protected by the requirement that the fees shall be reasonable and approved by the court. In our opinion one-third, on a contingent basis, is reasonable.

Under Subsection 4 of Section 8, as amended by Act 43 of 1922, where disability continues six weeks or longer, then after six weeks have elapsed compensation for the first week shall be allowed.

The heirs of plaintiff have made themselves parties in this court, but the widow has not. We think, though, that the right to compensation is a community asset and not a separate asset of the husband's estate. We are not advised whether the widow renounced the community or not. Under paragraph 4 of Section 18 of the act, the law provides that the judge shall not be bound by any technical or formal rules of procedure. We think this authority for making the judgment available to the widow should she claim it, though, of course, in her absence we cannot render judgment binding on her.

For convenience sake we shall recast the judgment of the lower court. That judgment is set aside, and it is now decreed that defendant United States Sheet & Window Glass Company is liable for compensation to the legal representatives of P. H. Connell in the sum of one hundred and fifty dollars with 5% per annum

interest from this date and the future sum of seven dollars and fifty cents per week, the first payment being due February 16, 1923, and continuing until the time of his death, with 5% per annum interest on each payment from its maturity. It is further decreed that said payments be made, two-thirds of one-half to the widow and two-thirds of one-half to Alfred H. Connell, Dool C. Connell; Mrs. Myrtle Connell Dixon, widow of B. W. Dixon, deceased; Dewey M. Connell; Mrs. Nora Connell O'Neal, wife of E. P. O'Neal; Mrs. Tollie Connell Wilson, wife of M. A. Wilson, and Charles W. Connell, the heirs of said P. H. Connell, unless said heirs procure and tender to defendant a disclaimer or other binding form of acquittance from the widow, in which event two-thirds of the whole shall be paid to them. It is further decreed that one-third of the whole be paid to Julius T. Long under his fee contract with plaintiff, which is hereby approved.

It is further decreed that defendant pay the costs of both courts.

ODOM, J., dissenting. I do not concur in the finding that plaintiff's disease was accelerated by the fall.

———

ON APPLICATION FOR REHEARING

REYNOLDS, J. The defendant insists that it should be granted a rehearing on the ground that plaintiff deliberately swore to a falsehood in stating that his teeth were knocked out by his fall and that plaintiff deliberately tried to perpetrate a fraud on the defendant and on the court by lying with reference to his teeth.

We cannot concur in defendant's estimate of plaintiff's testimony that his teeth were knocked out.

Plaintiff testified (page 7):

"Q. Lost your teeth, too, since you got hurt?

"A. Yes, sir."

(Page 21):

"Q. How long after the accident was it before you had your teeth pulled?

"A. I think about three or four weeks.

"Q. Had them all pulled?

"A. Yes, sir."

\* \* \*

"Q. Were your teeth broken off?

"A. No, sir, they were knocked loose, some of them.

\* \* \*

"Q. How many?

"A. Three or four.

"Q. What was the matter with the rest?

"A. Well, I had the pyorrhea."

(Page 22):

"Q. That was the reason the rest were pulled? Did the pyorrhea make those other ones loose?

"A. I guess so, I don't know.

"Q. Well, that is what pyorrhea does, doesn't it, makes them loose?

"A. I guess so.

"Q. Just in what way did this acciden cause your teeth to have to be pulled?

"A. I fell down the stairway and struck on the side of my face at the time.

"Q. Well, if only three or four of them were loose and none of them were broken off and if you had the pyorrhea, what did the fall have to do with pulling your teeth?

"A. He said they would have to be pulled.

(Page 25):

"Q. Your teeth were not knocked out?

"A. No, but they were knocked loose.

"Q. You say your teeth were pulled out three or four weeks after the fall?

"A. Yes, sir.

"Q. You stated you were unconscious for about six weeks?

"A. Yes, sir.

This evidence, as a whole, does not impress us as being perjury.

In fact, the more we study evidence the more we are impressed with the view of Edgar Guest that:

"When you get to know a fellow,
  Know his joys and know his cares,
When you come to understand him,
  And the burden that he bears,
When you learn the fight he's making
  And the trouble in his way,
Then you find that he is different
  Than you thought him yesterday."

The second, third and fourth grounds set up in defendant's motion for rehearing are fully covered in our original petition herein.

Defendant urges, as a fifth ground, that the court erred in allowing plaintiff judgment for $150.00 for medical attendance and nursing, and quotes paragraph 5 of Section 8 of the compensation act:

"The employer shall in every case coming under this act furnish the employee reasonable medical, surgical and hospital services and medicines not to exceed two hundred and fifty dolars in value, unless the employee refuses to allow them to be furnished by the employer; and in every case of death the employer shall pay or cause to be paid the reasonable expense of the burial of the employee, not to exceed one hundred dollars, and the reasonable contingent expenses in connection therewith, not to exceed fifty dollars."

Section 6 of the act provides:

"Any voluntary payments made by the employer or his insurer to the insured employee, during the period of his disability, or to his dependents, which, by the terms of this act, were not due and payable when paid, may, subject to the approval of the court, be deducted from the amount to be paid as compensation."

Under this last provision, if the defendant company had made any voluntary payments or had in any way furnished medicine, doctors or nurses, it could have

received credit for the same by furnishing proof of the service and of the value of the same.

But there is no evidence in the record showing the value of any service rendered or any claim on the part of defendant for such services.

Defendant urges, as a further ground for rehearing, that the court erred in holding that the assignment of one-third of plaintiff's cause of action and claim for compensation to his attorney was legal.

We recognize the right of plaintiff's attorney, under his contract of employment, as provided for by Act 124 of 1906, giving a first privilege to attorneys for the amount of their professional fees on all judgments obtained by them and on the property recovered by such judgments; and by which it was made lawful for an attorney by written contract, signed by the client, to acquire as his fee an interest in the subject matter of the suit binding on the opposite party after notice.

This was done for the reason that the Workmen's Compensation Act of Louisiana requires that the fees of attorneys and physicians be reasonable and that they shall be approved by the court.

Defendant further objects to the decree herein rendered on the ground that it would not be protected in the event it paid the judgment.

Mrs. Mattie Porter Connell has voluntarily made herself a party to the judgment and decree herein rendered and we have entered an order recognizing her as one of the parties to the suit.

In her application to become a party, Mrs. Mattie Porter Connell, widow of the plaintiff, Patrick H. Connell, asks that her rights in the suit be reserved.

The rights of Mrs. Mattie Porter Connell, insofar as they are adjudicated in this decision and decree, are fully and finally settled; but insofar as any rights that she may have that are not claimed in this suit, they are fully reserved as provided by law.

For the above reasons a rehearing is refused.