BRUNOT, J.
This is a suit for compensation under Act No. 20 of 1914 and amendments thereto, known as the Employers’ Liability or Workmen’s Compensation Act.
The defendants are a commercial partnership composed of Jacob Scharfenstein and Fredrick W. Scharfenstein, domiciled and doing business in the city of New Orleans.
The prayer of the petition is for judgment against the firm and the individual members thereof in solido for $39.85, the cost of medical services and medicines, compensation at the rate of $13.72 per week for 18 weeks from the date of the injury to the filing of the petition, and a like sum per week during disability, not to exceed 300 weeks, and for costs.
The court gave judgment in favor of the plaintiff for the sums prayed for, and for all costs, including the fees of the examining physicians.
From this judgment the defendants have appealed.
The answer denies that plaintiff was employed subject to the provisions of the Employers’ Liability Act. It alleges that the employment was to maintain and repair automobiles used by defendants in their coal and wood business, and that plaintiff was paid a flat wage of $24 per week.
Notwithstanding the allegations in the answer, defendants do not seriously contend that the case does not come within the terms of the Compensation Act, but seem to rely, for a reversal of the judgment, upon the following assignment of errors:
“(1) The trial judge erred in applying the case of John Behan v.’ John B. Honor Co., Limited, reported in 143 La. 348, 78 South. 5S9, L. R. A. 191SF, 862, to the instant case, for the reason that it is in no way analogous.
“(2) The trial judge erred in his finding of fact and in the law applicable thereto.
“(3) The trial judge erred in disregarding other issues raised by defendants which were in no way connected with the Behan Case.”
The defense in the Behan Cáse was that the plaintiff’s disability was not caused by *817 the accident, but was the result of a disease that was lurking in his system before the accident. The defense in this case is that plaintiff was not disabled by the accident, but that such injury as he may have thereafter suffered was the result of pre-existing physical, mental, and nervous ailments. It is alleged in paragraph III of the answer:
“That defendants do not know exactly the manner in which the injury was received; that the injury, if any, was slight, and of no consequence, and did not result in all of the injury and damage set out by plaintiff in his petition, and did not result in the total disability on his part to do any labor, and, if any such results as alleged by plaintiff followed the injury, such were due to plaintiff’s poor physical, mental and nervous condition; that defendants are informed and believe, and so allege, that prior to the alleged accident plaintiff was in a highly nervous and in poor physical condition; that he was subject to attacks 'of nervousness, to twitching and jerking of the face, head, arms, and body, and had been Jipr some time, prior to the accident taking medicine to remedy this condition; that plaintiff was guilty of excesses and abuses that have lowered his vitality and weakened him physically, and if he is now permanently disabled, and if he has suffered any of the consequences that he alleges followed from said accident, he has brought them on himself, and defendants are in no way liable therefor, either under the Workmen’s Compensation Act or the general law,” etc.
The facts as disclosed by the record are that plaintiff is a mechanic and machinist. He was first employed by defendants for a few months in 1917. He left this employment to enter the service of the federal government as a machinist at the New Orleans Naval Station, and was thus engaged when he enlisted in the service as a private in Company C, 114th Signal Battalion, United States Army. While in the service he injured one of his anides during bayonet practice at Camp Beauregard. The injured ankle incapacitated him for military duty, and he was discharged from the service on the 21st day ’of March, 1918, from which date he received War Risk compensation from the United States government. After the injury to plaintiff’s ankle he could not jump or run, but by strapping the foot and wearing a tight shoe this disability has not otherwise affected him or impaired his earning capacity as a mechanic or machinist. He was in this condition when he re-entered the employment of defendants, several months before the accident which gave rise to this suit.
Plaintiff was injured on November 19, 1918, while repairing the clutch of one of defendants’ trucks. Jake Scharfenstein, one of the defendants, was helping him. Plaintiff was holding the shaft and pipe, and Scharfenstein was holding the sleeve and forcing the clutch into place. The sleeve slipped, and mashed the first finger on plaintiff’s right hand. A nurse at the hospital dressed the injured finger, and on the following day Dr. Breaux, at the hospital, washed and bandaged the finger and administered antitetanic serum. Plaintiff then reported to his employer and worked until evening. On the following day, November 21st, the plaintiff, over his protest, was sent out to fix a truck. Plaintiff says:
“About 11 o’clock one of the trucks broke down on Magnolia street, the other side of Napoleon avenue, and it was raining, and Mr. Jake said: 'You have to go and fix that truck.’ I said: T have the serum in me; I’m afraid of getting hurt.’ " I went out, and it was raining, and while getting over to the truck and repairing it this side, my right side got hurt, and I fixed the truck, and reported to Mr. Jake on Dryades street, and said: ‘I’m all in; I can’t last any longer.’ I went home, and got to bed, and stayed there a couple of weeks until my mother got the doctor to relieve me; that was Dr. Breaux.”
, The weather report of the Weather Bureau shows a trace of rain on November 21, 1918, and the following temperature: Maximum, 76°; minimum, 59° Fahrenheit.
Dr. Halsey, Dr. Daspit, and Dr. May testified in the case, and Dr. Halsey, for the *820 defendants, and Dr. May, for the plaintiff, filed lengthy reports showing the result of their findings after an examination of the plaintiff.
During the trial, about one year after the accident, upon the application of defendants’ counsel, Dr. Halsey was appointed by the court to examine plaintiff, and the report filed by him is as follows:
“There is a partial paralysis of the serratus antieus muscle of the right side. This causes an abnormal position of the right shoulder blade, known as ‘winging,’ and an impairment in the function of the right arm. This impairment consists in a loss of power in this arm when raised above the level of the shoulder. This loss of powér is the result of a neuritis which developed about two days after the injury to the finger, and which at that time involved much of the brachial plexus. (This information as to the condition at that time was obtained from Dr. Henry Daspit, under whose care Donahoe was in the month of December, 1918.) Such paralysis following neuritis usually disappears entirely in the course of time, iand in this case it appears that all the nerves have recovered except the one supplying the serratus muscle. The present impairment of function should cause only relatively slight diminution in Donahoe’s earning capacity, as, except for movements above the level of the shoulder, his muscular power is good. ■
“This neuritis could not have resulted directly from the injury as described by Donahoe. The question arises whether or not this neuritis was the result of the injection of the serum which was administered in this case to guard against the development of tetanus.
“A search of medical literature has failed to support such hypothesis, nor have I ever seen such a result from the administration of antitetanic serum. Moreover, it is a matter of common experience to see neuritis develop without discoverable cause.” .
Dr. May examined the plaintiff five months after the accident. His history of the case coincides with that given in the report of Dr. Halsey, and continues as follows:
“Donahoe is splendidly developed, and has the appearance of having performed hard physical labor; heart and lungs normal; height, 5 feet, 9% inches; weight, 145 pounds; urine, Sp. Gr. 1021, trace of albumin, no sugar, no microscopic abnormalities. He denies luetic or other venereal infection.. This is an unusual case. Following the taking of seruip he became exposed to the cold, and had (from his description) what was probably an anaphalaetic reaction; he must also have had a neuritis of the right brachial plexus (evidence), weak grip and muscles of the right forearm and hand; he must also have a paralysis of the right serratus and other subscapular muscles, for his attempts to raise arm forcibly results in the right scapula leaving its normal position. * * * I believe he is unquestionably disabled, and also that the prognosis is unfavorable for recovery of use of. arm and shoulder. On the other hand, I have treated a very large number of cases of injury similar to his, and have never seen a single ease terminate as has his; therefore it might be well to go further into the case, and have Wasserman tests made (unless this has been done), especially before, you are disposed to consider a long period of additional disability.”
Dr. Daspit is of the opinion that plaintiff’s present impairment should cause only slight diminution of his earning capacity except for movements above the level of the shoulder, and that neuritis could not have resulted directly from the injury to plaintiff’s finger. It is the general rule, in his opinion, that neuritis will not result irom the injection of tetanus serum. He does not concur in the opinion that neuritis may develop without discoverable cause. He says:
“You can easily get the cause of neuritis if you look for it.”
He says plaintiff is, and was prior to the accident, a neurotic, an individual with poor nerves, and the injury plaintiff received would intensify that condition. He says manual labor and exposure to unfavorable weather conditions in combination, within 24 hours after an injection of tetanus serum, might produce neuritis.
“The serum injection1 with a poor serum reaction, together with chilling of the shoulder, would very probably play an important part in the development of the neuritis.”
Dr. Daspit testified that he had no idea whether plaintiff was then able to work, or *822 when he would be able to do work of any kind. The doctor says:
“I have never seen the identical case like this.”
We have not considered it necessary to review all of the testimony, because much of it relates to unimportant details'that are of little aid to the court in determining the real issue in the case, viz. defendants’ liability. In summing up the facts it is shown that plaintiff was not negligent or at fault, and that he is totally disabled to do work of a reasonable character. It appears with reasonable certainty that, whatever ailments the plaintiff may have had prior to November 19, 1918, his earning capacity and his ability to render efficient service as a mechanic and machinist was not appreciably impaired thereby. It does not appear that the injury to the finger alone could have caused the displacement of the shoulder blade and the serious affliction which the specialists have characterized as “winging,” but the fact remains that this result followed in perfect sequence the injury, the injection of the antitetanic serum, the exposure to cold and dampness, and .the performance of manual labor at the time and under the conditions shown to exist, and it is not denied that the work was performed over the protest of the plaintiff, at the command of the employer, who, himself, was fully cognizant of plaintiff’s injury, the injection of the serum, and of the weather conditions.
In disposing of the defense in the Behan Case this court said:
“There is scientific evidence in the record that the plaintiff was, after the accident and at the time of the trial, afflicted with loeomotorataxia — what phj'sieians call tabes dorsalis —and that an accident such as the one on which this suit is founded could not, of itself, have produced that disability. But it also appears from the expert testimony that the one and only disease that does cause locomotorataxia can remain dormant and undiscovered in the human system a very long time; that there have been cases where the disease did not assert itself within 20 years from the time of infection. There is no proof in this case that the plaintiff would be now or ever disabled by locomotorataxia if the accident he complains of had not happened. On the contrary, until the accident he was apparently in ordinary sound health, attending to his daily occupations, unconscious of being diseased, working regularly, earning large wages, and supporting his wife and daughter.”
In the present case there is no proof in the record that the plaintiff would be now or would ever be disabled by neuritis or by “winging” if the accident he complains of had- not happened. On the contrary, until the accident .he was apparently in sound health, attending to his daily occupations as a mechanic and machinist without inconvenience, and he was working regularly and earning good wages. The facts bring this case clearly within the ruling announced in Behan v. John B. Honor Co., Ltd., 143 La. 348, 78 South. 589, L. R. A. 1918F, 862. The judgment of the civil district court is, correct.
For these reasons the judgment appealed from is affirmed, at appellants’ cost.
■ Rehearing refused by Division B, composed of Justices DAWKINS, LAND) and LECHE.