## McPHERSON v. HILLYER DEUTSCH—EDWARDS, Inc.

### No. 1006.

Court of Appeal of Louisiana. First Circuit.

June 30, 1932.

Julius T. Long, of Shreveport, for appellant.

Thornton, Gist & Richey, of Alexandria, for appellee.

ELLIOTT, J.

Jesse I. McPherson, employed by Hillyer Deutsch-Edwards, Inc., as log cutter in the woods, was, while so engaged, struck on the head by the accidental fall of a limb from a tree and badly injured. The accident occurred on August 28, 1930.

Alleging his injury and that it had produced in him a "permanent total disability to do work of any reasonable character," he brought suit against Hillyer Deutsch-Edwards, Inc., for compensation at the rate of $11.70 per week for 400 weeks, less payments from the time of the injury until January 3, 1931, received.

Defendant for answer admits paying plaintiff compensation on account of said injury to his head, for the time stated, but denies owing him any more; alleges that, if the plaintiff at the present time, or has recently, been suffering from any ailment or disability, same is due entirely to other causes and not to the said accidental injury sustained while he was working for respondent.

The lower court, after reviewing the evidence in a written opinion, held that plaintiff had not established his right to any further compensation, and rejected his demand. The plaintiff has appealed.

The evidence shows that plaintiff was employed by defendant as alleged in his petition, and that while so engaged an oak limb, 3 or 4 inches in diameter at the large end and 12 or 14 feet long, fell from a tree, from a height of about 35 feet, and hit him on his head, a little to the right of the center of the cranium. The blow knocked him to the ground and rendered him unconscious for a period of time estimated by witnesses at from 20 to 30 minutes.

The plaintiff was carried from the woods to a physician employed by defendant. This physician, Dr. Waller, sewed up the scalp wound caused by the blow. He then tapped the spinal fluid, after which plaintiff was carried home. He remained at home in bed about a week, after which he got up and walked from his residence to the office of Dr. Waller, which we understand was about a quarter of a mile. After a few visits, Dr. Waller told him to stay in bed about two weeks longer. After about two weeks longer in bed, plaintiff left his bed and walked to see Dr. Waller at his office, for a time stated

to have been every other day for a while and then once or twice a week, in all about three months.

Dr. Waller then discharged him as well and stopped his compensation.

The plaintiff, with reference to the time of his discharge as well, testified that the physician in defendant's employ told him that he was not able to work, but defendant's agent told him that they were unable to determine whether the injury he got was the cause of his disability or not, and therefore stopped his compensation.

The Employers' Liability Act, Act No. 20 of 1914, § 38 (as amended by Act No. 38 of 1918) reads: "The word 'Accident,' as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening, suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury. The terms 'Injury' and 'Personal Injuries' shall include only injuries by violence to the physical structure of the body and such diseases or infections as naturally result therefrom. The said terms shall in no case be construed to include any other form of disease or derangement, howsoever caused or contracted."

Section 18, subd. 4 (as amended by Act No. 85 of 1926) provides: " * * * But all findings of the fact must be based upon competent evidence, and all compensation payments provided for in this act, shall mean and be defined to be for injuries and only such injuries as are proven by competent evidence, of which there are, or have been objective conditions or symptoms proven, not within the physical or mental control of the injured employee himself."

■Plaintiff must establish his right to compensation by competent evidence within the terms and intent of the law.

The trial took place on April 13, 1931, which was about nine months after the injury. Plaintiff testified that he was 44 years of age and had been engaged in work as a sawmill laborer for twenty-five or twenty-six years, which is saying in effect that he commenced such work at the age of 18 or 19 years and followed it as a vocation until he received the injury in question.

At the time plaintiff got hurt, he had been at work for defendant two or three months. Questioned as to his previous condition of health, he testified that previous to the time of his injury, he never had any disability or ailments of any kind; that he did not have any infected teeth, had never had the toothache in his life, and had always worked when he could get employment; that since his injury he had constantly suffered pain in his head and that he never had any such pain before; that he is not able to do hard labor, and that his memory is bad. He says: "I

can't speak anything quick because I can't think as to how I am going to say it. I have noticed that;" that before his injury he never had any failings of this kind.

The evidence shows that Dr. Waller, in the employment of defendant, examined plaintiff concerning his fitness for work previous to his employment. It was Dr. Waller's duty to ascertain by examination if the health and condition of plaintiff, seeking employment, was such as to justify the risk.

One of the physicians called by defendant was asked what kind of examination was given to a party applying for employment before he was put to work, and he answered: "Examine his eyes, ears, heart and especially for hernia, his nose ankylosis and whether crippled or not."

Within a day or so after plaintiff was examined he was employed and put to work in the woods sawing logs.

■ We cannot help but feel that Dr. Waller, after examining plaintiff, found him in fit condition to do manual labor of the kind he was ordered to do. If he had found any evidence of weakness, sickness, lack of strength, fever, high blood pressure, pains, or dizziness he would have reported it, and plaintiff would not have been employed. It is a matter of which we may take cognizance that the work of a laborer, in cutting logs in the woods, requires strength, endurance, and good physical state of health. Men suffering with any of the ailments which plaintiff was found to have following his injury would not have been employed had such ailments been known at the time.

■ Dr. Waller was in Rochester, N. Y., at the time of the trial, but, if his testimony concerning plaintiff's condition at the time he was examined for employment and at the time he was first brought before him for the treatment of the injury to his head would have helped in the defense, it could and presumably would have been taken.

Plaintiff had never, so far as known, complained of any pain, weakness, or disability of any kind until he received this injury on his head.

The testimony of his saw partner was taken. This witness was asked:

"Q. What kind of a hand was he? A. All right. A good hand.

"Q. Heard any complaint from him of pains? A. No, Sir. Only he said he had not cut any logs in some time and was kinder tender and soft."

This last answer evidently refers to some remark made by plaintiff to his partner at some time during the early period of his employment. The fact that he may have stated that he was kinder tender and soft because he had not cut any logs for some time tends to indicate his fitness for the work, because he overcame it and steadily continued his work

without interruption for two or three months following his employment.

We have noticed the statement of a trained nurse in the employ of defendant, who says that, after plaintiff had been discharged by the physician, defendant's agents sought to give him some kind of work, but plaintiff declined, saying that the insurance company was able to pay him to lay around and that was what he was going to do.

In view of the testimony of every physician interrogated as to the plaintiff's capacity for work after his injury, if he made such a statement, it was made as a joke on his situation.

None of the physicians who examined plaintiff, and there were seven of them, were asked to state a time when disability would pass away. The inference to be gathered from their testimony is that plaintiff's present condition is permanent.

The only conflict in the testimony is the difference in opinion among the physicians as to the cause of plaintiff's present condition.

The testimony of Dr. McKinney, an expert Roentgenarian, was taken by consent on April 10, 1931. He declined to be examined clinically, but testified that the X-ray pictures which he had made of plaintiff's head and vertebræ showed no fracture of the cranium or injury to the skull or cerebral vertebræ. He was asked the following questions:

"Q. Doctor, is it not a fact that fractures at the base of the skull are sometimes not shown by X-ray pictures? A. With modern methods with a Mueller line focus tube, instead of a Coolidge round focus tube with a bucky diaphragm and correct technique, to fail to find a fracture of the base of the skull, is a possibility but not a probability.

"Q. Doctor, did you use such a tube and such equipment as you stated, modern equipment, in your examination of this man? A. I did."

The evidence shows that about one month after plaintiff was injured he was further treated by Dr. Gray, also in the employ of the defendant. Dr. Gray opened his spinal column again and took out some more of the fluid, which the trained nurse who assisted on both occasions testified was, on each occasion, clear. There is testimony in the record to the effect that this is one of the means usually resorted to, when it is suspected that there may have been an injury at the base of the skull. If the fluid shows traces of blood, it is an indication that there exists injury at the base of the skull.

Then again we find in the record the testimony of physicians to the effect that the brain may be seriously injured as a result of a blow on the top of the head, and yet the skull may not be cracked and may not show any injury which can be detected by an X-ray.

Two physicians were examined by the plaintiff pursuant to his own request. This examination was made on March 12, 1931. These physicians both gave it as their opinion, based on plaintiff's history of the injury he had received, that his present condition resulted from the injury received on his head. One of them was asked:

"Q. Doctor, with a limb say 15 ft. long, 3 or 4 inches in diameter, falling for a considerable distance, striking him on the head rendering him unconscious all the way from 15 minutes to an hour, is that sufficient, with the history given you, to produce the symptoms that you found? A. Yes. It might do two things—A lick on the top of the head by a slowly falling body like a limb, might not have fractured the base of the skull and he could have had the symptoms that he complained of at the time and would result in the symptoms that he has now, or he could have had a severe concussion of the brain which would account for the symptoms he immediately had and the symptoms he has now, and if the history is true, that he had his spine tapped on two occasions, although he does not know what kind of fluid was withdrawn, but would indicate that the doctor treating him had in mind that he might have had a fracture at the base of the skull."

The physicians further testified that plaintiff's appearance indicated age more advanced than should exist in a man 44 years old. This physician did not take plaintiff's blood pressure nor examine his teeth, gums, nor tonsils, and said that infected teeth, gums, and tonsils might be the cause of his condition.

Another physician who examined plaintiff at his own request, found high blood pressure, infected teeth and tonsils, but, taking the history of the case as stated to him in hypothetical questions, which we have taken into account, he was emphatically of the opinion that plaintiff's present condition was not due to infected teeth, gums, nor tonsils, but to the blow which he received on his head, but admitted that his teeth and tonsils might be a contributory cause.

The plaintiff was also examined by physicians at the instance of the defendant. One of them testified that he had examined plaintiff on February 9, 1931, and that he found plaintiff to be older than should be the case with a man 44 years of age; that he had arteriosclerosis, enormously enlarged tonsils; that his mouth, gums, and teeth showed a marked infection and his blood pressure was too high; that his radial arteries were thick and tensile and very difficult to compress with the fingers; that there were some varicose veins of the left leg. Asked concerning the fact that plaintiff had temperature for a month or more following his injury, he gave it as his opinion that plaintiff had temperature for months previous to his injury,

and was of the opinion that the blow which plaintiff had received on his head from the falling limb was not connected and had nothing to do with his present condition, but that his present condition was due to causes existing a long time previous thereto. The following are some of the questions propounded to him and his answers thereto:

"Q. Well Doctor, these conditions have been in process of development for some time? A. Yes, Sir.

"Q. Well, if he was able to work at the time he received the blow and is unable to work now, is it possible that the blow hastened the development of the condition existing? A. I do not think so. If this man was brought in for the usual preliminary examination for occupational work and submitted to the usual routine medical examination for such work, he would be classified as a poor risk and under the usual examination would be disbarred or he would be refused as a nonacceptable risk.

"Q. Then you do not consider that he is able to do manual labor at this time? A. I do not."

This opinion of Dr. Holcomb was shared by three physicians in defendant's employment who had treated plaintiff after his injury. One of these physicians had examined plaintiff some months after the injury in order to ascertain the cause of the fever which plaintiff was found to have and which had refused to yield to treatment. He, together with all the other physicians who had examined plaintiff at the instance of the defendant, found that he had high blood pressure, infected teeth, tonsils, and arteriosclerosis. They expressed the opinion that plaintiff's present condition was due to these infections and conditions and not to the injury to his head, and that the injury to his head had nothing to do with his present condition.

■ In this conflict of opinion on the part of the physicians we hold that the opinion advanced by the physicians who examined plaintiff at his request must be accepted as correct. Their opinion is supported by corroborating facts and circumstances and the sequence of events.

. We are firm in the conviction that plaintiff has established his case by competent evidence, within the terms and intendment of the Employers' Liability Act.

We therefore hold that plaintiff was in good sound health, free of any disease of the disabling kind which would incapacitate him for the work he was employed to do and engaged in doing at the time he was injured; that his present condition of pain and suffering and total disability to do work of any reasonable character is not due to any disease existing in him at the time of his employment, but to the injury received from the falling limb, but, if any disease did exist, it was dormant, inactive, and was only activated and set in motion by the blow on his head.

■ The plaintiff's case comes within the rule that—"Where injury results in disability which is established and the disability is continuous, the law does not distinguish between that caused by the injury established and that which may be more particularly attributed to disease, but will allow recovery for the disability shown to exist as the immediate cause of the injury."

The courts have so held in many cases, using different language as may be adapted to the situation found to exist. The following cases support in principle the present situation: Connell v. U. S. Sheet & Window Glass Co., 2 La. App. 93; Henderson v. Louisiana Power Co., 9 La. App. 475, 121 So. 217; Blackman v. Hope Engineering & Supply Co., 11 La. App. 92, 120 So. 682; Patrick v. Grayson & Yeary, 13 La. App. 228, 127 So. 116; Brown v. Joseph Rathbone Lumber Co., 11 La. App. 599, 123 So. 383; Wroten v. Woodley Petroleum Co., 12 La. App. 348, 124 So. 542; Anderson v. Louisiana Oil Refining Corp., 16 La. App. 294, 134 So. 343; Joiner v. Texas & P. R. Co., 128 La. 1050, 55 So. 670; Craft v. Gulf Lumber Co., 151 La. 282, 91 So. 736; Hicks v. Meridian Lumber Co., 152 La. 975, 94 So. 903; Behan v. John B. Honor Co., 143 La. 348, 78 So. 589, L. R. A. 1918F, 862; Donahoe v. Scharfenstein & Son, 154 La. 815, 98 So. 256.

The judgment appealed from is in our opinion contrary to the law and the evidence and therefore erroneous. The plaintiff is entitled to recover as prayed for.

For the reasons stated, it is ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and set aside, and judgment is now rendered in favor of the plaintiff Jesse I. McPherson and against the defendant Hillyer Deutsch-Edwards, Inc., for compensation as a total permanent disability to do work of any reasonable character, at the rate of $11.70 per week during the period of disability, not, however, beyond 400 weeks. The term for the weekly payments is to be computed from August 28, 1930; each deferred installment to bear legal interest from the time it was due until paid. The said compensation due the plaintiff herein is held to have been paid up to January 3, 1931. Defendant-appellee to pay the cost in both courts.