GLADNEY, Judge.
Claude N. Lacy sues herein to recover total and permanent disability benefits under the Louisiana Workmen’s Compensation Act, LSA-R.S. 23:1061 et seq., alleging injury as a result of an accident sustained on December 10, 1954, while engaged in the course and scope of his employment with Miller & Company, whose compensation . insurer was Employers’ Mutual Liability Insurance Company of Wisconsin. By a supplemental pleading plaintiff alleged at the time of the accident he was also employed by Phillips Petroleum Company, and made that corporation a co-defendant. Following trial on the merits, judgment was rendered against the defendant insurer for compensation of $27.30 per week for twenty-one weeks, together with medical expenses. Appellant’s demands against the Phillips Petroleum Company and for attorney’s fees and penalties were denied. From the judgment so rendered, the defendant insurer has perfected appeals to this court and Lacy, after appealing only from that portion of the judgment limiting compensation to twenty-one weeks has filed an answer to the appeal, asking the judgment be increased by awarding disability for a period not to exceed four hundred weeks, and for the imposition of penalties and attorney’s fees under LSA-R.S. 22 :658.
Presented for our consideration are issues which relate, first, .to the occurrence of an accident and its connection with plaintiff’s disability; second, the extent and duration of the disability sustained by plaintiff; third, the imposition of penalties and attorney’s fees; and fourth, the denial that plaintiff was an employee of the insured, Miller & Company.
Plaintiff, aged forty, a resident of Caddo Parish, Louisiana, was engaged as a common laborer on a mineral lease owned by the Phillips Petroleum Company near McLeod, Texas, when on Friday, December 10, 1954, he experienced pains in his stomach, chest and shoulder, which he explains came upon him under the following conditions:
“We were mixing the concrete up in a wooden box and I was toting it in a five gallon' bucket and he was pouring the steps and I was haying to go over the fire wall toting the concrete in the bucket, and that is when I first noticed the burning and hurting; it began hurting.”
At the time this happened Lacy and Billy Paul Carty were engaged in mixing, carrying and pouring concrete for some steps being constructed under the supervision of Ed Griga. The occurrence of the pain was reported to Billy Paul Carty and the latter offered to help relieve Lacy by carrying some of the cement. Lacy testified the pain was first noticed about 11:00 o’clock and during the afternoon it grew worse but he continued to work, mixing cement and carried some in buckets. Plaintiff was taken home that afternoon by Ed Griga. His wife, Ruby Lee Lacy, testified that when he arrived home he was in pain and she helped him to undress, treated him with Musterole, and applied a hot water bottle. She stated he could not eat any supper, could not sleep and was restless because of pain. On the following Monday morning Lacy voluntarily went to see Dr. J. O. Broyles. Thinking that possibly the employee had had a heart attack the doctor recommended that he go to the hospital for observation and treatment, which Lacy did. As a consequence of examinations at the Confederate Memorial Medical Center plaintiff was operated on February 28, 1954, for eventration of the diaphragm. Plaintiff appears to have made a normal recovery from the operation, but asserts he is totally and permanently disabled in that he can no longer do the same type of work he was doing at the time when he sustained his injury.
Appellant earnestly insists that plaintiff’s condition was not and is not related to his work or employment. In support of the contention, medical evidence has been ad *607 duced for the purpose of showing that trauma cannot, and in this instance did n.ot, cause the abnormal condition diagnosed as eventration of the diaphragm, and which required surgery. ' The resolution of this question rests upon the weight to be. accorded the opposing medical views reflected in the record. Available for our consideration are the records of the Confederate Memorial Medical Center which disclose the diagnosis made and performance and results of the surgery. This documentary evidence is of value principally as to the origin and source of the pain which Lacy suffered and complained of while employed on December 10th and perhaps has some bearing on our appraisal, of the ability of plaintiff to continue doing heavy manual labor. Good results were obtained from the surgery. However, it is pointed out the seventh rib was resected or pared off during the operation and scar tissue' will form and the silk sutures used will remain. These residuals taken alone are not indicative of further disability. Medical testimony was furnished by Drs. J. O. Broyles, S. W. Boyce and James H. Eddy, Jr. We have examined most "carefully the testimony of these witnesses for an answer to the question as to whether the performance of duties in Lacy’s employment was related to his condition.
In order for a layman to have a proper understanding of the medical testimony relating to this issue of cause and effect, it is necessary to understand the functions of the diaphragm in its relationship to other organs of the body. In a volume entitled “Legal Anatomy and Surgery”, Edition of 1930, by Bernard S. Maloy, there appears this informative statement:
“Part of the lower portion of the pleura is reflected or thrown back upon the diaphragm, which is the thin muscular structure . stretching or a.rching across the inside of the chest, and separating the lungs and heart above it from the stomach, liver, and intestines below it. The diaphragm bows up, or has its convex surface looking upward. When- it contracts it descends, and thus. aids in respiration by forming a larger space for the lungs to fill with air above it. When;, it relaxes it pushes upward against the' lungs, and helps to force the air out of them. * * * ”
Dr. James H. Eddy gave this further explanation of the functions of the diaphragm and described operative procedure to correct eventration of the diaphragm:
“Q. Doctor, would you please tell us what is the function of the diaphragm? A. The diaphragm has two functions; one is to separate the thoric or chest cavity from the abdominal cavity, that is the barrier, and second it is an organ of respiration.
“Q. What is the relationship of the diaphragm from’ an anatomical viewpoint to the ribs? A. The diaphragm takes its origin from the ribs; it is a muscular organ with large muscles of a thickness that may be from slightly over a quarter or one-eighth inch in thickness, and the muscles are attached in a circular fashion from the inside of the ribs and inside the breast bone and pass from the backbone; these muscles function in a manner like a tent; if you can think — let me take my handkerchief here and show you; if you will think of the dome surface of a circus tent; it is attached on the side, so is the diaphragm attached like the corners of the tent; a central portion where it attaches is called the center tendon because it is a tendonous type material.
“Q. How does it react upon ballooning, as you have described there? A. The effect of the diaphragm is to increase in size the chest cavity and it does that by moving dawn from its position, again using the circus tent for illustration, and the dome top is up in the chest cavity, and it stretches out flat, that is where the diaphragm is but when the muscles flex they convert themselves from that dome to a plain surface and that in effect increases the size of the chest cavity which increases the,pressure and causes air to be sucked in and then these muscles relax and allow themselves to move back up to *608 the position they were in formerly; they decrease in size and diminish in pressure which forces the air out.”
< * * * * * *
"Q. Doctor, would you describe for us the operation that is performed to correct this eventration? A. A number of procedures have been suggested ; all of them start at some spot with a folding or plicating. For the benefit of what we can see in a simple folding procedure, I will try again with the handkerchief; if I put my hand into this handkerchief it makes a dome at the top; it domes up like a tent; this would represent the situation that occurs in the eventration. That is, the dome is the high point. If you would think of a more nearly normal diaphragm it is a very slight dome, more like that (indicating with his fist inside the handkerchief) ; if we take the case of eventration where the diaphragm is pushed way up into the chest — to a high point, then the repair consists of taking in the diaphragm; you might say taking tucks in the diaphragm; take one tuck and sew that; then take another and another until you kind of get it back gathered in altogether and we have then fastened the diaphragm back down. We have converted the dome to its normal size and put it into the diaphragm. That is one method and that is the method done in this particular man’s case. In other cases sometimes it is fitted and reinforced in this area and they have sewed it in some cases into what is called flags. The procedure is simply to fasten the dome down and take it down out of the chest.”
Dr. Broyles, when placed upon the witness stand was questioned but briefly by counsel for plaintiff and no questions were asked by the attorneys for appellant. It is clear that Dr. Broyles after referring Lacy to the Confedeate Memorial Medical Center was not thereafter cognizant of the treatment and condition of Lacy. He was asked the question if after an operation for eventration of the diaphragm, would the individual be able to do hard physical work? A direct answer was declined by the witness as not presenting sufficient facts for an opinion. A further hypothetical question was that if a needle was inserted in the abdomen and air pumped therein under pressure causing the abdomen to extend until something gave, where would that point be? The doctor responded by saying the weakest place would give and it was possible for the diaphragm to be extended or ruptured. The testimony elicited from the doctor, therefore, is not particularly helpful in assisting us to determine whether or not the occurrence of the eventration of the diaphragm was caused or affected by the labor being performed by Lacy on December 10, 19S4.
The testimony of the two remaining medical witnesses is directly contradictory. Dr. S. W. Boyce gives the opinion the disability was caused by Lacy lifting and carrying five-gallon buckets of cement, and further, that although the operation was skillfully performed and plaintiff’s diaphragm is now in its normal position, Lacy should never hereafter resume common labor requiring any heavy lifting and that he is, therefore, totally and permanently disabled. Dr. Eddy testified that eventration of the diaphragm is not caused by trauma except where there is a crushing injury such as sustained in automobile accidents, but is usually congenital in its origin, and he further stated his opinion that as a result of the operation Lacy’s diaphragm is now normal and he is capable of performing in the same manner any type of work he has ever done.
As plaintiff’s right to recover herein is dependent upon the evaluation which we accord to the opinions expressed by Drs. Boyce and Eddy, we have reviewed their testimony as thoroughly as possible. The judgment rendered by the judge a quo holds that Lacy’s disability was caused by or related to his employment but its duration was only twenty-one weeks. No written reasons for judgment were assigned by the judge. In our appraisal of the diver *609 gent views expressed by Drs. Boyce and Eddy, we feel justified in stating that a disabling condition from eventration of the diaphragm is of unusual or rare occurrence and there is a paucity of informative writings evidencing a relationship with trauma. The testimony of the two aforementioned doctors discloses that during their extensive medical practice they were cognizant of but one or two such cases.
These observations would seem to indicate, at least so far as this suit is concerned, the opinions of the two medical experts are not strongly fortified by specialized study or experience. We reach this conclusion not with a spirit of criticism but from an endeavor to properly evaluate the medical evidence.
Dr. Boyce testified Lacy was hurt when he lifted a heavy object and this brought on the condition for which he was operated. As to the residual condition following the operation, Dr. Boyce opined that Lacy is now limited at least seventy-five (75%) per cent by the operation. He considered the patient in much better physical condition than he was before the surgery but thought it inadvisable for him to go back to heavy manual labor until January, 1956, and said he should not ever lift five-gallon cans of cement or anything that heavy. He said Lacy now does not have a normal diaphragm but one made up of scarred tissue and sutures which would be subject to more tearing again if he lifted heavy objects, or had unusual pressure over the abdomen. With reference to the pain and condition which brought on the necessity for the operation, the doctor stated Lacy was “severely affected by something; I don’t know whether he hurt himself carrying cement or not. He got it carrying something.” And asked if the diaphragm could not have been extended and stretched without herniating, he related:
“Without the tearing, yes, sir, that is my opinion of what happened. The individual muscles and tissues were stretched and torn a little at a time, like the one I talked about operating on, and you have enough relaxation of the whole diaphragm to have them just stretch and then relax instead of all of the tearing at one time.”
Dr. Boyce did not subscribe to the theory that plaintiff’s disability whs solely caused by a congenital condition, stating that in his opinion he had not had this thing all of his life because he would not have been doing manual labor with a defect like that.
Dr. Eddy gave the following answer to a question as to whether there was any relationship between Lacy’s employment and his condition:
“There is no relationship between eventration of the diaphragm and trauma. In my own experience I have never found any. People I have talked to, surgeons who have seen this condition, have not related it to trauma and I reviewed the literature back as far as 1950 trying to find some relationship to trauma that somebody might even have suggested, and I could not find it. Nor do I, when I think about it, find any possibility that it could be traumatic in origin.
“There is more and more thought that eventration is something you are born with, and it is simply discovered the first time somebody takes a chest picture.
“The people who have put forward the theory that this thing is congenital have used four points to illustrate why they think so:
“First, they point out that eventration is almost always on the left side; a collected series shows at least nine to one on the left side as compared to the right. They point out that is congenital because the left diaphragm is much more complicated than the right.
“The second thing is that the condition is present in the fetus — the baby not yet born. The idea here is that in development it is present so that you can’t ever consider birth trauma as having anything to do with it. So the *610 second reason is that it is seen in babies before they were born.
“The third is the absence of symptoms over a very long period of time. I think this man in this particular case found it all of a sudden but it had been there all along; he has never found it and will not until he has a chest picture and it is discovered.
“The writer in one of these articles said he had never found an adult who had ever had a chest picture until the time the eventration was discovered. He reasoned back and found they did not have the picture until something called it to their attention. There are exceptions where a tumor of the area has occurred. Such conditions are probably all congenital and only appear late in life when the first chest picture is taken.
“Unfortunately, there is a tendency in many people merely to confuse even-tration with hernia when oftentimes even the diagnosis is difficult.
“The essential point is that in even-tration the diaphragm is present in all parts of the membrane separating the thorax from the abdomen, that is the muscles thin out; this is not a place where -the muscle fibre is separated and missing such as in a hernia; in a true eventration there must be a layer of pleura muscle and peritoneum. It thins out in the fibres instead of tearing.
“They are confusing because they look alike but actually in eventration the diaphragm thins out, moves up to a high position; in eventration there is usually some little movement in respiration, very minor and there may be none.”
The foregoing excerpts and expressions substantially state the basis for the opinions as stressed by the two principal medical witnesses on the causal relationship between plaintiff’s employment and his condition. In the light of the medical testimony can we hold plaintiff has established his case to a legal certainty ?
The rule has been often stated by this and other courts that the plaintiff carries the burden of proof to establish his claim in a workmen’s compensation suit and that conjecture and probability may not serve as a basis for judgment in such a case. In Roberts v. M. S. Carroll Company, Inc., La.App.1953, 68 So.2d 689-693, this- court expressed the requirement as follows:
“Under the circumstances, and in view of the even balance as between the evidential support of the opposing contentions of plaintiff and defendants, we can only conclude that plaintiff failed to support his claim by the requisite preponderance of the evidence. The most that could be said in support of plaintiff’s position is that he has succeeded in establishing a possibility of disability resulting from the accidental injury. The jurisprudence of every appellate tribunal of this state has incontrovertibly established the rule that the plaintiff in a compensation case, as in other cases, bears the burden of proof. He is required to establish his claims to a legal certainty by a reasonable preponderance of the evidence. Speculation, conjecture, mere possibility, and even unsupported probability, are not sufficient to support a judgment. These principles have been stated, restated, iterated, reiterated, emphasized and reemphasized, in almost innumerable decisions, among which we mention only a few of the latest citations: * (There follows some twenty-seven citations in support of the announcement.)
Where, as in the instant case, there is a serious- conflict in the medical testimony the court often looks to lay evidence in order to find some certainty upon which to base an opinion. Unfortunately herein, the only lay evidence in the record was tendered for the purpose of establishing certain facts concerning which there is no dispute. These are the experience of pain by Lacy on December 10th and his subsequent suffering. No great assistance, therefore, can be derived from such lay *611 testimony or warrant us in evaluating it along with the conflicting medical opinions.
In Taylor v. Mansfield Hardwood Lumber Company, 1953, 65 So.2d 360-363, this court made the following observations:
“Perhaps the first case in which compensation was awarded for the aggravation of a pre-existing disease or the activation of a dormant disease was that of Behan v. John B. Honor Company, Ltd., 1918, 143 La. 348, 78 So. 589, L.R.A.1918F, 862. In that case compensation was granted to a longshoreman who received a blow upon the head. In discussing the relationship of the injury to the disease, Judge O’Niell found that prior to the accident the employee apparently was in sound health, attending to his daily occupation without inconvenience, was working regularly and earning good wages, but because of the injury from the accident and the immediate change in his physical condition there could be no doubt the accident superinduced and was the proximate cause of the disability of which complained. His form of reasoning has been followed in: Donahoe v. Scharfenstein & Son, 1923, 154 La. 815, 98 So. 256; Broussard v. Union Sulphur Company, 1927, 5 La.App. 340; Causey v. Kansas City Bridge Company, La.App.1939, 191 So. 730; Custer v. Higgin’s Industries, Inc., La.App.1946, 24 So.2d 511; Vautrot v. Maryland Casualty Company, La.App. 1947, 32 So.2d 500.
* * * * * *
“It is only sufficient that plaintiff show that the accident during his employment caused an injury which contributed to the disability or hastened the progress of his disease, thereby shortening his life. It is not required he prove the exact cause of his disability. See: Phillips v. Yazoo & M. V. R. Co., La.App., 2 Cir. 1938, 183 So. 43, 46; Clifton v. Glassell-Taylor Co., La.App. 2 Cir. 1944, 19 So.2d 590; Lowery v. W. Horace Williams Company, La.App., 1 Cir. 1942, 8 So.2d 704.
“It was pointed out by this court in Biggs v. Libbey-Owens-Ford Glass Company, Inc., 1936, 170 So. 273, that the difference in the employee’s condition arose while he was performing the services of his employment and even though the disability was not immediately caused by an unusual strain of physical effort or some awkward movement of the body, it was sufficient for recovery that the affected parts of his body gave way while at work for defendant.”
Taylor v. Mansfield Hardwood Lumber Company involved the question of whether trauma aggravated a pre-existing cancer. It is well recognized in our jurisprudence that cancer can be aggravated by trauma. This was held in the cited cases of Causey v. Kansas City Bridge Company, La.App. 1939, 191 So. 730; Custer v. Higgins Industries, Inc., La.App.1946, 24 So.2d 511, and other citations to which we need not refer.
The instant case involves an issue as to whether there is any relationship whatsoever between straining while carrying a heavy bucket of cement and the condition of plaintiff. It is denied that the employment did in any wise contribute to the condition later discovered. This court in Hogan v. Stovall Drilling Company, Inc., 1951, 55 So.2d 284, 286, said:
“The burden of proof even though accorded the liberality established in our jurisprudence, must be read in the light of accepted facts that the medical profession neither knows the cause of leukemia nor whether an acceleration or aggravation of the disease can be induced by external means. Little medical proof is available.”
In determining a causal relationship in medical problems in Vautrot v. Maryland Casualty Company, La.App.1947, 32 So.2d 500, 504, Dr. Guy Caldwell of New Orleans, an eminent orthopedist, stated:
“If there were continuing symptoms from the time of the fall through the time of the severe symptoms which in *612 dicated the actual collapse of the vertebra, you would have to think of the two as being related.”
In attempting to reach a decision we believe to be material and relevant our findings that: first, the record fails to disclose plaintiff suffered from or had any knowledge that there existed a potential eventration of the diaphragm prior to his experience of .pain on December 10th, which came upon him while he was actively engaged in performing heavy manual work. From "the time when such pain was first experienced, symptoms of his disability were continuous from December 10th until the following February 28th when the operation was performed; and second, the medical' evidence as presented discloses there are some theories but little proof as to a causal relationship between work straining and precipitation of the condition styled eventration of the diaphragm.
After reviewing as thoroughly as we can the evidence and especially the medical testimony, we cannot say there is manifest error in the judgment from which appealed, and we find that we should adhere to the decision of the trial judge, holding that plaintiff’s condition resulted from the injury of December 10, 1954.
Appellant contends Lacy did not sustain an accident within the meaning of the’ Workmen’s Compensation Statute. The record demonstrates beyond doubt that plaintiff did experience for the first time pain while engaged in his work while carrying a five-gallon bucket of cement, and it is our opinion that the pain so experienced was produced by the eventration of the diaphragm.
The trial court established the duration of plaintiff’s disability as twenty-one weeks from the date of his injury. The evidence on this point, we think, adequately supports the holding of the District Court, and we approve of the conclusion so reached.
Lastly, we deem it necessary to consider the question raised by counsel for the appellant that plaintiff was not an employee of Miller & Company. It is argued that Lacy was an employee of Phillips Petroleum Company. The charge is not made out. The latter company is not now a party litigant since the judgment of the trial court rejected plaintiff’s demands against it and there'has been no appeal from that portion of the judgment. The question is only material as to the employee-employer relationship between plaintiff and Miller & Company. The following facts were stipulated between the Employers Mutual Liability Insurance Company of Wisconsin and Phillips Petroleum Company:
“C. L. Banks is employed by Phillips Petroleum Company as a lease foreman and has been so employed in the Mooringsport, Louisiana, area for approximately nine years.
“Miller & Company is engaged in the oil well servicing business which substantially consists of the furnishing of equipment and labor for reworking and servicing oil wells. They also engage in the furnishing of labor for lease maintenance work.
“Employers Mutual Liability Insurance Company of Wisconsin is the compensation insurer of Miller & Company.
“Under date of December 9, 1954, C. L. Banks issued a work order to Miller & Company authorizing the performance of certain work upon a lease owned and operated by Phillips Petroleum Company, said work order being No. 506945 attached hereto and made a part hereof.
“Following the issuance of the above work order C. L. Banks employed Claude N. Lacy for the account of Miller & Company for the purpose of assisting in the performance of the work authorized under the above mentioned work order.
“The work in which Claude N. Lacy was engaged was under the supervision and control of C. L. Banks.
“Upon the completion of said work C. L. Banks prepared a time statement showing the names of the men working upon this job and the hours worked *613 by them and the rate of pay for which they had been hired. This statement was forwarded by C. L. Banks to Miller & Company at New London, Texas. A copy of the time sheet in connection with the above mentioned work order is attached hereto and, made a part hereof.
“Under the agreement existing between Phillips Petroleum Company and Miller & Company laborers were to be paid on the basis of $1.05 per hour and Miller & Company was to bill Phillips Petroleum Company for these services at the rate of $1.30 .per hour. ‘Pushers’ were to be employed on the basis of $1.50 per hour and Phillips Petroleum Company was to be billed on the basis of $1.85 per hour. The difference between the amount paid to the worker and the amount charged by Miller & Company was to cover the insurance, overhead and profit (if any) of Miller & Company.
“Upon receipt of the above mentioned time sheet Miller & Company issued its payroll checks to each of the named workers and then forwarded those checks to the workers and at the same time forwarded- to C. L. Banks an invoice showing the charges of Miller & Company, a copy of the invoice issued in connection with work order No. 506945 being attached hereto and made a part hereof.
“The invoice of Miller & Company was O. K.’ed by C. L. Banks, forwarded to his immediate superior for approval who in turn forwarded it to the home office of Phillips Petroleum Com-' pany in Bartlesville, Oklahoma to be placed in line for payment.
“Operations under the above arrangements have been carried on by these companies for approximately ten years.”
 The insurer’s liability, of course extends only to the legal liability of its insured. We find the facts show the liability of Miller & Company for the reason that Lacy was either its direct employee or was an employee of its independent contractor -under LSA-R.S. 23:1061 of the Workmen’s Compensation Act, and therefore, the distinction, if any, is immaterial.
Thus under the foregoing stipulation we find that it was immaterial whether Lacy was an employee of Miller" & Company or Phillip's Petroleum Company.
Although counsel for appellee has answered the appeal seeking an .award for penalties and attorney’s fees, the contention has not been pressed in argument or brief. We find no merit in the contention because of the serious issue as to causation, and the demand will be denied.
By way of recapitulation, we hold that plaintiff was totally disabled within the meaning of the Workmen’s Compensation Act from an accident due to his employment; that said disability was of twenty-one weeks’ duration; that penalties and attorney’s fees are not due under LSA-R.S. 22:658 and that Miller & Company was responsible for any workmen’s compensation due Lacy. This is in accord with the judgment from which appealed and it follows from these findings that the judgment should be and is hereby affirmed at appellant’s cost.