GLADNEY, Judge.
Plaintiff’s suit for the recovery of workmen’s compensation alleges that while she was employed by James “Buck” Horton she sustained an accident which aggravated a pre-existing cancerous condition of the breast and as a consequence she became disabled. Horton and the workmen’s compensation insurer, the defendants herein, oppose this action by contending plaintiff’s employment was not covered by the Louisiana workmen’s compensation act, but if so determined, there is no causal relationship between the accident and the disability. After trial judgment was rendered in favor of plaintiff for compensation but claims for statutory penalties and attorney’s fees were rejected. The defendants have appealed from the judgment and appellee has answered the appeal to have the judgment amended to include penalties and attorney’s fees, and to increase the allowance for certain expert witness fees.
The business of Horton is described as that of a dealer in second-hand pipe, but actually his interests seem more extensive in that they embrace the operation of oil wells, pulling oil well casing, dealing with Scrap pipe and iron, and the warehousing of oil field supplies. The center of his operations is in Oil City, Louisiana, where he maintains a two-acre yard or lot enclosed by an iron fence. Situated on the lot are two buildings about 100 feet apart. The largest of these is a structure 40 x 80 feet with a porch. The interior thereof is largely used as a warehouse or storage place for pipe, fittings and supplies, but in one corner there is enclosed a room which is used as an office where clerical work is done. When the accident of which plaintiff complains took place, an electric motor and a drum of paraffin were deposited and left on the porch. The other building on the property is a small shop that houses electrically operated machines for straightening and threading pipe. Conveniently located is an old fashioned gasoline pump from which trucks used in the business are serviced, one of which motor vehicles being equipped with a winch for loading and unloading pipe. Used pipe is stacked and scattered at different places in the yard and there is a receptacle or enclosure into which is placed scrap iron and pipe to be later sold as junk. Near the north-side of the yard is a producing oil well connected with storage tanks. The foregoing, we think, fairly depicts the place where plaintiff daily performed the duties connected with her employment.
When first employed, no doubt, Mrs. Pixley was required to do work only of a clerical nature and some janitor work, such as sweeping and cleaning a bathroom. As time went on, however, with her employer’s acquiescence, she performed other services on behalf of her employer.
Mrs. Pixley testified Horton and the two employees who customarily looked after the handling of transactions relating to the pipe and who operated the pipe threading and straightening machines were frequently *115 absent from the yard because of their work in the oil field. On these occasions which usually occurred during good weather, she was left alone at the place of business and she attended to customers who came to buy or sell pipe, fittings or iron. In order to locate pipe of a desired dimension she had to walk through the yard in the proximity of stacked and unstacked pipe and close to the straightening and threading machines. She related that pipe was left on the yard in a more or less disorderly manner. At times she said she stood on the running board of a truck to measure the pipe thereon and had to climb and reach high into bins of fittings. On several occasions she serviced motor vehicles from the gasoline pump.
Horton and one of his former employees testified they never did see Mrs. Pixley perform these services, but their testimony, we think, is inconclusive and unsatisfactory for Horton admits Mrs. Pixley did measure pipe and it would further appear that services performed by her in the yard took place when Horton and his other employees were away. We believe, therefore, that it is substantially shown Mrs. Pixley did render services other than functions related to her clerical and janitor work.
Whether the business should be classified as hazardous, or as non-hazardous as contended by counsel for appellants, in our opinion, is not controlling. The statute referred to as the employers liability act or workmen’s compensation act, LSA-R.S. 23:1021-1351, declares in section 1035 that the provisions of the act shall apply:
“to every person performing services arising out of and incidental to his employment in the course of his employer’s trade, business, or occupation in the following hazardous trades, businesses and occupations: * * * ”
which are then designated, and then provides further that:
“If there be or arise any hazardous trade, business or occupation or work other than those hereinabove enumerated, it shall come under the provisions of this Chapter. * * *”
The latter clause is a mandate to the courts to determine the hazardous nature of businesses or occupations not therein designated as such. Repeatedly the judiciary of this state has recognized that the workmen’s compensation statute is humane in its purpose, and its scope should be enlarged rather than restricted. Its provisions have been liberally construed, so as to include all services that can be reasonably said to come within them. Consistent with these rulings it is no longer seriously questioned that where an employee is required to discharge both hazardous and non-hazardous duties, it is immaterial that his injury or death occurred while he was engaged in non-hazardous work, because there is only one employment and one compensation. This legal principle is sometimes known as the Byas doctrine, taking its name from Byas v. Hotel Bentley, Inc., 1924, 157 La. 1030, 103 So. 303, wherein the Supreme Court gave this interpretation to the applicable provisions of LSA-R.S. 23:1035. The case is a landmark now firmly fixed in our jurisprudence.
Some years later in 1940, the author of the opinion in the Byas case, Justice Rogers, was the author of the opinion in Brownfield v. Southern Amusement Company, Inc., 1940, 196 La. 73, 74, 198 So. 656, which held that the use or maintenance of an automobile does not make an occupation a hazardous occupation, so as to extend the protection of the workmen’s compensation law to a driver thereof who would not otherwise be within the act, where the automobile is so remotely connected with the employer’s business as to make the risk from the operation thereof negligible. It was also pointed out in this case that in applying the provisions of the statute to cases where employees are injured in a business not specifically mentioned therein, the inquiry is always whether or not the duties of the injured employee required him to perform services of a hazardous nature *116 incidental to his employment and directly associated with his employer’s business. And even where the employer is engaged in a hazardous business within the meaning of the workmen’s compensation law, but the services of a particular employee are entirely non-hazardous and the employee is not subjected, even remotely, to contact with danger from the hazardous features of the business, the employee has been denied compensation. See Brown v. Remington Rand, Inc., La.App.1955, 81 So.2d 121; Cf. Coleman v. Sears, Roebuck & Company, La.App.1955, 83 So.2d 469.
The foregoing interpretations concerning the application of the statute point up the question: did plaintiff perform hazardous duties and were they a substantial part of her work? The Byas case, so we above observed, held that performance of hazardous duties, which constituted a substantial part of the employment of one employed in a non-hazardous business rendered compensable an accident sustained in the performance of non-hazardous duties. In the instant case we are of the opinion the evidence preponderates that Mrs. Pixley performed a substantial portion of her work in the yard where contact with or proximity to heavy oil pipe, junk, electric machines, trucks and gasoline, among other things, imposed danger to her life and limbs. It is, therefore, our conclusion the employment of plaintiff falls within the coverage afforded by the act.
The record discloses the appellee, a fifty-four year old married woman, had enjoyed excellent health prior to an accident, the details of which are related below. On March IS, 1956, while at work, Mrs. Pixley went from her office out on the front porch of the building for the purpose of sweeping the porch. In doing so she tripped upon an iron door stop and fell heavily upon a large electric motor. Her fall was severe enough to break her glasses and a dental bridge. In falling, her breast made direct contact with the motor and was badly bruised.
Prior to this time Mrs. Pixley had never noticed any pain or discomfort, nor was aware of any lump or mass in her right breast. A day or so later her right breast became sore and tender and the lower half became black and blue. The breast remained sore and about two months later she felt a lump about two inches below and one or two inches laterally to the nipple. During the following weeks the breast became larger and the lump did not disappear.
On August 13, 1956, about five months after the fall, she consulted Dr. Wallace H. Brown, a local surgeon and oncologist. Upon his examination of the right breast he found it to be larger than the left and containing a fullness in the outer quadrant. On August 23, 1956, an inci-sional biopsy was performed and after microscopic examination a pathological finding of malignancy was made. A radical mastectomy was performed on August 30, 1956, at which time Dr. Brown removed the breast, including the axillary fat in continuity, and this was submitted to a pathologist, Dr. U. H. Stoer, who made a diagnosis of infiltrating duct carcinoma of the breast, with metastases to the two lymph axillary nodes.
The report and findings of Dr. Stoer and certain pertinent facts as above related formed the basis of hypothetical questions propounded to medical experts to elicit opinions as to whether the trauma occasioned by Mrs. Pixley’s accident on March 15, 1956, aggravated her cancerous condition. The report and Dr. Stoer’s opinion reads:
“Received fresh a right breast including pectoral muscles and axillary fat in continuity. Covering the breast is an ellipse of pale skin 21 x 12 cm. with a nipple slightly off center toward the midline. Curved around the areola laterally is a fairly recent surgical incision, the edges closely approximated by separate black sutures. Subcutaneous fat extends beyond the *117 skin margin for about 6 cm. medially and laterally, and 4 cm. inferiorly. The skin and nipple are grossly normal. Beneath the skin incision is a defect in the breast tissue S cm. in greatest depth. The edges of the defect are for the most part approximated with only a small space filled with blood tinged fluid. Multiple sections of the breast reveal about a fifty-fifty mixture of soft elastic greyish-white breast tissue and fat. Adjacent to the posterior margin of the surgical defect is a circumscribed firm not encapsulated grey-white mass about 2' cm. in greatest diameter. ■Cut surfaces have a few chalky white streaks. No other area suggestive of neoplasia noted. In the axillary fat is found 12 lymph nodes, the largest 1.5 cm. in greatest dimensions. They are somewhat firm, but uniformly tan on cut surfaces without gross metastasis. Representative sections submitted.
“Microscopic diagnosis: Infiltrating duct carcinoma of breast with metastases to two axillary lymph nodes. Sections from different areas of the parenchyma other than the 2 cm. firm area noted grossly in which there is definite invasion, reveal extensive intraductal cellular proliferation, no doubt intraductal carcinoma.”
The question was addressed to seven witnesses, all of whom are outstanding members of the medical profession in the treatment and diagnosis of cancer. Their reputations have been enchanced by their education, research and experience. Drs. Willis P. Butler, U. H. Stoer and W. R. Matthews have had extensive practice in the field of pathology. Dr. Wallace H. Brown specializes in oncology and Drs. G. H. Cassity, James H. Eddy, Jr. and I. F. Hawkins are general practitioners and surgeons particularly familiar with the carcinoma type of cancer. It was Dr. Brown who diagnosed the condition of August 30, 1956, and Dr. Matthews, upon suggestion by Dr. Stoer, also examined the tissues of plaintiff’s breast and muscles removed in the operation of Dr. Brown. It is interesting to note that for many years Dr. Butler not only served as a pathologist for several of the hospitals located in Shreveport, but was the coroner of Caddo Parish. He testified he has performed approximately 11,000 autopsies where tissues were examined for cancer and has accumulated more than 60,000 slides of specimens of malignant tissue. Incidentally, Dr. Butler himself has been a victim of cancer and after fourteen or fifteen years of practice he reversed his own views that a single trauma would not aggravate cancer.
An analysis of the expert testimony reveals three of the witnesses, viz., Drs. Cassity, Butler and Hawkins, opined the accident sustained by Mrs. Pixley exercised a stimulating effect upon her preexisting cancerous condition. After noting that the medical profession has not yet recognized the true causes of cancer, the aforementioned witnesses based their opinions on their own experiences and a continuity of plaintiff’s symptoms and the progress of the disease immediately following the trauma at or near the site of the malignant tumor. They reasoned the black and blue condition of the breast indicated in all probability there must have occurred some hemorrhage in the diseased tissue and presented an avenue of escape for live cancer cells into the healthy tissue. It was stressed that prior to the trauma there were no manifestations of the presence of the disease but thereafter there was an immediate continuing deterioration in Mrs. Pixley’s health.
On the other hand, Drs. Brown, Stoer, Eddy and Matthews, with some exceptions, subscribed to the opinion there was no causal relationship between the trauma sustained and the pre-existing cancer. Their views .rested on several grounds.
First, it was testified proof through scientific ■ research has failed to recognize *118 such causation and that as of now the majority of the profession reject the viewpoint there is a significant relationship between cancer and trauma. However, only Drs. Eddy and Matthews refused to concede there are exceptions. They asserted the growth and energy of cancer cells is predetermined by conditions from which they arise and consequently are not affected by subsequent trauma. Their next point was that in plaintiff’s case the growth of the malignant tumor was exactly as they would have expected had there been no trauma. The testimony indicated the tumor in Mrs. Pixley’s breast was deeply imbedded, being located five centimeters (about two inches) from the nearest skin, and Drs. Stoer and Matthews testified they found there was no infiltration of the cells into the superficial tissues. From these findings it was thought that if the trauma had stimulated the growth of the cancer cells or caused them to spread into live tissues the more superficial part of the tissues of the breast would have been so affected. But this was not disclosed by the pathological ex-mination. Finally, Dr. Matthews was of the opinion that it is more or less impossible for trauma to stimulate the activity of cancer cells. He reasoned that at first the primary cancer is more or less quiescent and grows slowly but as the live cells gain momentum and reach a certain state of activity, which latter stage he believed had occurred in Mrs. Pixley’s case, a mechanical trauma would not cause the growth energy of the cancer cells of the breast to further increase.
Certain admissions were made by the witnesses for the defense. Nearly all admitted that repeated trauma or constant irritation may cause a cancer or aggravate a pre-existing malignancy. It was not denied the generally accepted policy of the medical .profession is that an operation to remove, a. cancerous, tumor should be resorted to as soon as possible after a biopsy discloses malignancy in order to avoid possible danger 'that trauma resulting from an incisional biopsy would cause the cancer cells to spread. Further, it was admitted generally by all witnesses that extreme care was practiced to prevent infection from live cancer cells. Another exception was admitted by Dr. Matthews who acknowledged a single severe truma miay result in the aggravation of a sarcoma cancer of the bone.
Despite the extensive experience of the medical experts who testified, some of these confessed they have had little, if any, actual experience involving the effect of severe trauma to the tissues around a cancerous tumor. Perhaps Dr. Butler, because of his experience as coroner, was more experienced in this respect.
This court, as well as other courts of this, state, on a number of occasions has considered the question of causal relationship here-being discussed. Most of these cases are-referred to in Taylor v. Mansfield Hardwood Lumber Company, La.App.1953, 65 So.2d 360 and Lyons v. Swift & Company, La.App.1956, 86 So.2d 613. Several of the-witnesses who have testified in this case-likewise testified in Lyons v. Swift & Company. The cited cases and the authorities, therein mentioned show the court has heretofore recognized trauma can activate or aggravate a cancerous condition.
It was stated in the Taylor v. Mansfield Hardwood Lumber Company case that in cases involving an aggravated or a preexisting cancer the medical profession is. uncertain as to the relationship of trauma to the progress of the disease and that the cause of cancer is unknown. These observations are still true and for these reasons professional opinions on this subject must be appraised with consideration given* to. the limitation of the professional knowledge.
Our courts have been enjoined by the Legislature, to. accord liberal interpretations to the workmen’s compensation act. Therefore, it may well be recognized that differences exist between the medical profession and the courts in the evaluation- *119 and resolution of a medico-legal issue, especially one arising in a workmen’s compensation case. Thus, in Biggs v. Libbey-Owens-Ford Glass Co., Inc., La.App.1936, 170 So. 273, the issue presented was whether the difference in an employee’s physical condition arose while he was performing the services of his employment, and this court held that even though the disability was not immediately caused by an unusual strain or physical effort, or one awkward movement of the body, it was sufficient for recovery that the affected parts of his body gave way while he .was at work for defendant. We must acknowledge, therefore, that compensation cases are judicially decided more frequently on probabilities than on rigid requirements for supporting evidence.
After a most careful consideration of the wealth of medical evidence contained in the record we are of the opinion it does not disclose manifest error in the judgment considered on this appeal. We have come to this conclusion for the following reasons: plaintiff prior to the accident was apparently in sound health and attending to her daily occupation without inconvenience, and was working regularly without any warning of the existence of a cancerous tumor in her breast; that immediately after the accident there was a change in her physical condition with the first manifestations of the disease; and that her condition progressively became worsened until the diagnosis of cancer was made. Confronted with similar evidence our courts have held the accident super-induced and was the proximate cause of the disability of which complained. Behan v. John B. Honor Company, Ltd., 143 La. 348, 78 So. 589, L.R.A.1918F, 862; Dona-hoe v. Scharfenstein & Son, 1923, 154 La. 815, 98 So. 256; Broussard v. Union Sulphur Company, 1927, 5 La.App. 340; Causey v. Kansas City Bridge Company, La.App.1939, 191 So. 730; Custer v. Higgins Industries, Inc., La.App. 1946, 24 So.2d 511; Vautrot v. Maryland Casualty Company, La.App.1947, 32 So.2d 500; Lacy v. Employers Mutual Liability Insurance Company of Wisconsin, La.App.1956, 86 So.2d 605.
We now revert to the demands of appellee presented in her answer to the appeal, which demands are that plaintiff is entitled to statutory penalties and attorney’s fees and certain expert witness fees should be increased. We are of the opinion the claims should be denied. Appellants, in our opinion, have presented a most serious defense and are justified in opposing this suit. We find nothing arbitrary or capricious in the action so taken, which can justify an award of penalties and accordingly, we agree with the trial court the demands should be rejected.
Appellee has requested the fees of Drs. Hawkins and Cassity be increased to $75 each and the fee of Dr. Willis P. Butler increased to $125. Although we must acknowledge inflation has had a considerable impact upon the dollar value, nonetheless we are inclined to leave the determination of such fees to the trial court, except where manifestly erroneous. The amounts awarded by the trial judge do not appear to be unreasonable and the application for an increase thereof is denied.
The judgment from which appealed is affirmed at appellants’ cost.