CARLOS ORTIZ CANDELARIO, Petitioner, *v.* INDUSTRIAL COMMISSION OF PUERTO RICO, ETC., Respondent; STATE INSURANCE FUND, Intervener.

No. CI-62-22.     Decided May 15, 1964.

*José Ramón Freyre Montero* for petitioner. *Donald R. Dexter, Miguel A. Guzmán Soto, Carmen Ana Archeval,* and *José R. Martínez* for the Manager of the State Insurance Fund.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

Carlos Ortiz Candelario, petitioner herein, has worked as a laborer for Central Aguirre for 33 years, the last 12 as irrigation foreman. In this employment he was in charge of the irrigation of the cane fields, opened and closed the head gates, kept a record of the workers, and customarily carried

a shovel with a long handle for some cleaning job in the irrigation. On March 21, 1959, which was a Saturday, the cane cutters did not report for work. Upon superior orders in view of what seemed to be or was an emergency, the irrigation foremen, among them petitioner, were switched from their habitual work to cane cutting. Never before that day had petitioner done this kind of work, nor was cane cutting part of his employment. He cut cane from 9:00 a.m. and in the afternoon at the end of the day's work he presented a blister between the index and thumb fingers of the right hand caused by the machete and which burst and started to bleed. It bled profusely and thereupon he reported to his immediate superior, the cane-cutting overseer. The latter bandaged the worker's hand with a handkerchief and told him to report to the office. The record does not disclose that any action was taken that day. When he started to work the next work day he reported his case to his habitual superior, the irrigation overseer. This man decided that what he had there was unimportant and ordered him to continue working, that the work was pressing. Petitioner did not dare abandon the work. He continued in his habitual work the days which followed, but the hand kept swelling and bleeding, he experienced much pain when he used the shovel, and the injury did not heal but kept growing worse. He therefore sought medical assistance in the hospital of Aguirre where the enterprise sent its laborers. For some time his hand was treated every other day, although he continued working in that condition, until finally he became disabled.[1]

---

[1] Among the grounds adduced by the Fund for disallowing compensation, it stated that assuming, without accepting, that the accident was a labor accident, the laborer had no right either to receive compensation because he had reported untimely to the Fund for medical treatment. The respondent Commission made no pronouncement as to this ground and possibly it was not impressed by it. We are not convinced in the light of the record. Petitioner reported to his superiors the injury sustained, and the latter, deciding on their own account that it was unimportant or for some other reason, apparently took no action on the matter. On the other hand,

Dr. Enrique Acevedo testified that on May 26, 1959 he treated petitioner for an infected callus on his right hand. That day he disinfected the callus, treated it and administered antibiotics. Petitioner continued receiving treatment and working. On July 29, 1959, in view of the fact that his condition did not improve nor heal, he removed the callus. A few days later, August 3, he gave the laborer a certificate of temporary disability. Lastly, on October 17, 1959, petitioner was referred to the Oncological Clinic upon noticing that the injury of the hand persisted. Dr. Acevedo testified that according to the clinical record of the hospital, prior to March 21, 1959 petitioner had been treated in January 1955 for a benign furuncle or abscess on his left shoulder; in December 1955 he received treatment for gastritis and again in January 1958 for lack of appetite only. The clinical history did not disclose that prior to March 21 the laborer had suffered from his hand.

The State Insurance Fund offered the testimony of Dr. Hamlet Hazim, Director of the Oncological Clinic of Ponce. He testified that on December 18, 1959 he examined the petitioning laborer who brought with him a history of development of an ulcer between the fingers within a period of eight months. He performed a biopsy and diagnosed the case as skin cancer with metastasis on the axillary ganglia. Shortly thereafter petitioner's entire right arm was amputated.

Upon questioning by the Fund, Dr. Hazim said that the characteristics of skin cancer may be a tumor or an ulcer; that that of the laborer was in an advanced stage because it had already produced metastasis; that he could not say how long the disease had been in progress to reach such a

___

the laborer was treated by Dr. Enrique Acevedo in the hospital of Aguirre where the State Insurance Fund had a dispensary in charge in part of Dr. Acevedo as company physician to take care of Fund cases.

stage, but that the development of skin cancer was slower than that of any other cancer so that there is time for diagnosis and cure; that skin cancer very rarely produces metastasis; that it was likely that petitioner's disease was more than eight months old, approximately from one to two years; that the laborer could have had before those eight months a malignant injury in the place claimed by him and that the trauma could have been produced over the injury.[2] Referring to the trauma produced by cane cutting on March 21, 1959:

Fund:
"Could it be said that that trauma alone described here by the claimant—upon questioning by this attorney he said that that was the only time in his life he had cut cane, his hands were in good condition; that he had never had a blister on that hand—could have produced the type of cancer found?
[Objection]

.    .    .    .    .    .    .    .

Commissioner:
. . . The question is whether an injury of that nature could have originated or begun on March 29, 1959.
Dr. Hazim:
That day only, no. That the cancer developed following one trauma alone is not acceptable.

.    .    .    .    .    .    .    .

Commissioner:
What causes cancer, doctor?
A. We do not know what is the etiological cause. We may know the etiological factors which contribute to a cancer tumor, but what could have caused it, we do not know.
Q. Does a wound cause cancer?
A. Not a wound, trauma only."

Upon questioning by petitioner's attorney, Dr. Hazim further testified:

---

[2] Nine months elapsed from the injury sustained in cane cutting to the examination and diagnosis of cancer.

Mr. Freyre:

". . . When you examined that man the first time, did you notice that the ulcer which you claim he had on his hand had been submitted to biopsy?

A. No.

.      .      .      .      .      .      .      .

Q. Will a repetition of traumas, slight traumatisms, produce an ulcer?

A. That's right.

.      .      .      .      .      .      .      .

Q. Doctor, what is a trauma?

A. An injury caused to the tissues.

.      .      .      .      .      .      .      .

Q. Doctor, one more question, a continuous irritation, for an indefinite time, may cause cancer?

A. Yes, sir.

Q. Doctor, are the causes of cancer known?

A. No.

.      .      .      .      .      .      .      .

Q. The histogenetic granuloma of the cancer?

A. We do know of the external causes. Now, what produces it, we do not know.

.      .      .      .      .      .      .      .

Q. This man's type of cancer, how is it reproduced in the human body?

A. The skin cancer very rarely produces metastasis, it is very rare, and when it produces it the malignant cells eke their way through the lymphatic vessels and settle in the lymphatic ganglia, they travel through the lymphatic channel and form another tumor on the right axilla.

.      .      .      .      .      .      .      .

Q. Summing up, doctor, you heard the evidence offered this morning before this court. A person who suffers a laceration on the hand, that the hand swells as a result of the laceration, the blister or wound breaks up and bleeds; that during three long months he uses his hand continuously with a violent instrument . . . .

Fund:

Objection. Working violently.

Commissioner:

Objection sustained. In his usual work.

Mr. Freyre:

His usual work in the irrigation of cane. If that irritation persisted during that time, is there medical knowledge at that stage that could say what caused the cancerous formation to that laborer?

A. As I said before, so far it has not been scientifically accepted that trauma alone produces cancer. Definitively not.

Q. But it is also produced by irritation over that trauma?

A. Continuous irritation may produce cancer, continuous and chronic irritation."

The Fund attempted to prove with the testimony of the irrigation overseer that neither the fact that the laborer was put to cut cane nor that he injured his hand in that activity occurred that day, March 21, 1959. Obviously, the Commission did not give credit to this evidence since in its findings it concluded that those facts had occurred. In fact, no other conclusion was proper in view of the laborer's preponderant evidence on the occurrence of those facts. The Fund also attempted to prove with that witness that petitioner was suffering from that hand, and that since 1954 the witness at. times wore a bandage on it. The evidence on this point was most conflicting and the Commission made no specific finding of fact in either sense.

The refusal of the Commission to compensate this case was based on the brief findings which we copy below:

"It is well settled by the case law that a laborer who claims compensation for a labor accident is bound to prove that the alleged accident was the proximate cause of his disability.

"In our opinion, neither the evidence on the facts nor the medical evidence supports in the least claimant's theory.

"The testimonies of Drs. Acevedo and Hazim tell us clearly that prior to the alleged accident this laborer was already suffering from a cancerous condition of his right hand, and that

it was so old that it had produced metastasis, which is not frequent in skin cancer, and that if the laborer had sustained the alleged labor accident, it had no relation to his cancerous condition, nor brought it about, nor aggravated it."

As to those conclusions, it may be observed that Dr. Acevedo expressed no opinion on cancer. In his opinion, the injury was an infected callus and treated it as such. And from the testimony of Dr. Hazim offered by the Fund it does not appear conclusively in the record nor by reasonable inference that the trauma which the laborer sustained while cutting cane did not aggravate a cancerous condition of the skin, which probably already existed according to his testimony, or did not accelerate the process of metastasis, thereby causing the malignant cells to spread to the axilla and hence the laborer's incapacity for work as a result of the total amputation of his arm. On the contrary, if as stated by Dr. Hazim the skin cancer develops and grows slowly and very rarely produces metastasis, in the light of all the facts in the record a rational inference from his testimony would rather be adverse to the foregoing conclusion on the non-existence of aggravation. Apart from these observations, the medical expert evidence evaluated in the light of other elements of judgment in the record does not afford such a simple solution for the litigious question as it seemed to the Commission—under criteria of compensation in the sphere of labor accidents—in determining petitioner's right to compensation for the disability involved herein.

Section 2 of the Workmen's Accident Compensation Act—No. 45 of 1935 (Sess. Laws, p. 250)—prescribes that its provisions shall be applicable to all workmen covered thereunder who suffer injury or are disabled, or lose their lives by reason of accidents caused by any act or function inherent in their work or employment and which occur in the course of said work, and as a consequence thereof or . .

. . Under the most evolved concept of labor accident prevailing at present, which no longer rests necessarily and solely on the existence of such external, sudden or unforeseen event in the course of employment which may be traceable as to time and place, but which may also be the unexpected or surprising injury or effect, the product of an act performed in usual and ordinary circumstances of work,[3] the trauma sustained on his hand on March 21 or the damage caused to the tissues—as Dr. Hazim defined the concept—constituted for petitioner, who was not used to cutting cane and that, as he said, his hands were tender for that type of work, an injury resulting from a labor accident and in the course thereof, even though the same work of cutting did not produce similar injuries to other laborers used to it.

The problem somewhat more complicated which this case presents arises when it is necessary to determine whether or not the amputation of the laborer's arm resulting in permanent disability, which otherwise would not have existed despite the injury or trauma, was the result of such injury or trauma, or whether or not there was causal relation between the amputation and the injury; and, lastly, in view of the legal rule contained in § 2 *supra* for the solution of this type of litigious controversies, the determination of whether the record, taken as a whole together with all the circumstances and elements of judgment present, offers under any possible rational consideration a state of absolute nonexistence of causal relation between the laborer's *work* and his *disability* to warrant a judgment disallowing compensation.

---

[3] *Fernández* v. *Industrial Commission*, 85 P.R.R. 284 (1962); *Salazar* v. *Indus. Comm.; Mgr. State Fund, Int.*, 76 P.R.R. 102 (1954); *Grays Hatchery and Poultry Farms* v. *Stevens*, 81 A.2d 322; *Neylon* v. *Ford Motor Co.*, 91 A.2d 569; *Derby* v. *Swift and Co.*, 49 S.E.2d 417; *Young* v. *Western Furniture*, 164 N.W. 712; 1 Larson, Workmen's Compensation Law, § 12.20 *et seq.*; 41 Neb. L. Rev. 101 *et seq.* (1962); 43 *Id.* 27 *et seq.* (Dec. 1963).

In the matter of cancer, medicine does not recognize nor accept trauma as a cause of that disease. It disclaims knowledge of its causes, but it holds conclusively that whatever they are, they are of a pathological order. It concedes, however, although somewhat remiss, that trauma may be a factor to be taken into consideration in the aggravation of the tumor or in its progress and growth and in the acceleration of the metastatic process.

Notwithstanding the medical opinion and its reluctance to find causation between trauma and cancer, except perhaps in the case of chronic irritations caused by an agent, the courts have allowed and continue allowing compensation—in the general area of damages as well as in the most particular area of compensation for labor accidents—in cases of trauma followed by disease, disability or death from cancer whenever in their opinion they have found, in the succeeding order of facts and circumstances to be evaluated, a causal relationship between the trauma and the disease, disability or death from cancer, with some logical and rational sense of probability. If not so frequently the courts have attributed to trauma the origin of a cancer followed by an unknown disability or death such as are the causes of this anomaly in the body—and there are decisions in that sense notwithstanding the medical opinion—very frequently the courts have considered trauma as an element or factor of aggravation and acceleration of the ailment, or as a factor in the acceleration of an aggravating metastatic process which carries the tumor to other places, all of which precipitates a disability or death. The fact that the courts have not abided blindly by the medical criterion in cases of traumas and the ensuing disease, disability or death from cancer, is due to the well-known position of inequality of approach which the doctor, within the discipline of his science, and the trier or agency which adjudicates the right of the parties, are bound

to assume in a legal controversy on the concept of causation between those events. We already had occasion to say something on this diverse approach of causal relationship with respect to the decision of legal controversies of this type in *Feliciano* v. *Industrial Commission*, 84 P.R.R. 188, 205 *et seq.* (1961), and in *Meléndez* v. *Industrial Commission*, 85 P.R.R. 54 (1962). See the discussion of the subject in the chapter *"Cancer and the Law,"* 5 Lawyer's Medical Cyclopedia 469 (1960), especially the exposition under the topics *"Trauma as Cause of Cancer,"* p. 484 *et seq.*, and *"Trauma and Cancer,"* pp. 492–541; Henry H. Kessler, *"Accidental Injuries—The Medico-Legal Aspects on Workmen's Compensation and Public Liability,"* under the topic *"Trauma and Malignancy"* (1941), pp. 564–73, particularly the postulates stated at p. 567. As a good illustration of the subject, see also the presentation thereof offered in an unbiased but objective form by Professor Ben F. Small in his documented work *"Gaffing at a Thing Called Cause: Medico-Legal Conflicts in the Concept of Causation,"* published in 31 Texas L. Rev. 630–59 (1953).[4]

---

[4] By way of illustration, we state in part some of the concepts collected and summarized by Professor Small based on medical and legal authorities, particularly in connection with trauma and cancer. For example, the writer comments that even at present the medical cause of cancer is slightly more than the physician's conjecture. What might cause the mistake cells to lie dormant or become activated, or why the equilibrium of the cells in their relation to each other becomes disturbed, remains a mystery. With respect to trauma and cancer, he points out that it is there where the principal divergency begins between the medical criteria and the legal approach as to causation between one thing and the other, except in the case of chronic irritations. In his pathological concept, the doctor will concede some factorhood for trauma, or reject it as the source or cause of cancer, although he accords some recognition to the trauma factor in aggravating or accelerating existing neoplasia. He admits that trauma and the complications which it produces may help a tumor break down its resistances and it may aid its growth and spread, increasing its rate of progress. But he also explains that a malignant tumor is never static and tends to get worse. That the aggravation factor is inherent in the disease, and so is acceleration. It is the same with metastasis in which the doctor

■ The courts as a whole have awarded compensation to laborers who after sustaining a trauma on a particular site on his body has presented or developed a cancerous condition which prior to the trauma, if it actually existed, was not appreciable. In such situations the fact that prior to the

---

will accord trauma a relationship in the primary liberation of the malignant cells, and will give it a mention in speaking of localization and growth of the cells after liberation. But the doctor speaks skeptically of both situations and points out that metastasis is entirely normal at certain stages. He admits that trauma may help set the scene for secondary growth, but that other factors, largely unknown at present, determine the localization of metastases. Although the divergencies of criteria in the causal order are present in the entire field of torts, in the area of workmen's compensation the gap is even wider since here the causal relationship varies somewhat, according to the less stringent criterion of causation in labor accident cases.

Professor Small comments, with ample citation of authorities, that the courts have been most liberal toward the claimant where he can show that he suffered trauma or injury at, or very near, the precise location of the cancer. If that proximity exists, it seems to matter little whether he is claiming for old growth aggravated or new growth initiated. Despite the doctor's denials of traumatic cause, the courts have allowed awards where trauma-site and growth-site coincide. These cases go on and the accepted rule seems to be that if a claimant shows cancer, either old or new, as the point of injury, ordinarily the courts will allow recovery. They have also allowed awards in the case of cancer in an internal organ of the body where there has been trauma. For example, it has been held that a sprained ankle has aggravated a stomach cancer, a strained back has aggravated a brain tumor and a testicle cancer, where a burned hand aggravated a cancer in the pancreas, or an explosion made a jaw cancer worse. If metastasis has occurred, the factor of distance between cancer point and trauma point does not of itself rule out a connection between the two. The doctor does have difficulty in separating cause from etiology; to him, both represent a kind of pathological explanation of the disease. If he is unable to identify the initiating cause of cancer, he will still consider it a pathological one. He will recognize certain other factors, among them trauma, and recognizes that traumatic history has preceded an unusually high number of cancer developments. He will admit that trauma may influence aggravation, accelerate the metastatic process, and even have an influence on activation of previously unnoticed areas of neoplastic predisposition. They accept more readily criteria of activation of inherent physical anomalies, in view of their own experience with the touchy nature of those anomalies, as in the case of cuts, bruises, moles, small tumors and growths, and supernumerary organs. But it is a well-settled criterion that where a labor trauma and a cancerous condi-

trauma the laborer was in good health and reported every day for work without any symptom indicative of the existence of cancer, has been pointed out as controlling factors to award compensation; that subsequent to the trauma his health and physical condition have deteriorated and that the cancer developed or was initiated at the site of the trauma.

tion, whether aggravated or new, coincide in the same site of the body, the cancer is considered in all likelihood as one brought about by a labor accident.

As to the legal position of the trier in this complex problem of causation, Professor Small comments that where the risks are known and understood, the only problem is in relating risk to the legal action, but that in cancer cases the appraisal is not so easy, since so little is known of the risk in the first place. Accordingly, some improvision from circumstantial evidence is necessary. In such case the circumstantial evidence is the only evidence, and in that evidence will be many indications that trauma may aggravate existing cancer or accelerate its growth, may aid metastasis, and may activate previously quiescent precancerous conditions. Clinical reports show an incidence of traumatic history preceding many cancers. These evidentiary bits establish a relationship between trauma and cancer. Trauma is a risk factor even for medical men. In the legal approach it is the risk. For the trier the factor is sufficient in determining whether such risk bears enough relationship to defendant's liability. And in the particular area of workmen's compensation, the nearness of that relation is not clouded by the word cause, since the compensation formula requires that the harm be one arising out of and in the course of employment. Workmen's compensation is a statutory scheme of liability in which the employment absorbs the cost of all harms which arise out of its existence. Although there must be a relation between the harm and the employment, the test is a looser one than that in ordinary tort cases. It is not a faulty liability, and the moral considerations of oughtness in the tort cases are of no moment. Relative guilt or innocence of the parties is not considered, and a defendant's liability in this field of workmen's compensation will not rest on whether the character of his role in an accident makes it seem morally just or unjust. Whether both parties are wholly without fault or wholly with fault, makes no difference. Workmen's compensation is an enterprise liability, a liability of occasionment, embracing all risks occasioned by the employment and its incidentia. The personal injury risk stands in the same category with the other risks of operating overhead which the employment occasions. It is like the cost of replacing equipment. The employment, then, is responsible for a cancer harm, fault or no fault, if the employment occasioned it. Again the risk of trauma appears. If trauma is a risk factor of consideration in cancer development at all, the employment's occasionment of trauma brings that risk, slight though it may be, into engagement.

The case of *Sepesi* v. *Pittsburgh*, 174 Atl. 590 (Pa. 1934), is an illustration of the consideration given to these factors. In that case a laborer who had a sore lip received a trauma on that place. The blow to the lip grew worse and some time later it was found to be cancer. In affirming the compensation administratively awarded to the laborer, the court stressed the factors already mentioned as determinative of the ruling. In this, as in many other cases, the courts have considered the fact that since the cause of cancer is unknown, a claimant or a laborer cannot be required to establish categorically the causal relation between the trauma and the presence or development of the tumor. The compensation, the courts have said, must rest on logical inferences and probabilities, particularly in relation to the diseases or ailments in which medical science itself may not agree.

In *Voorhees* v. *Smith Schoonmaker Co.*, 92 Atl. 280 (1914), the laborer worked in a woodworking shop which required the exercise of pressure with his stomach. He experienced a severe pain while working and was compelled to stop working. It was established that he had a large rupture on the abdomen where he exercised pressure on the posts. He died two days later as a result of cancer. In awarding compensation, the Supreme Court of New Jersey points out the fact that the laborer was performing ordinary work which was too heavy for his diseased condition, and said: "So that even if deceased was suffering from internal cancer, it was quite within the province of the court to find that the proximate cause of death was the unusual and forcible pressure on parts weakened by disease, which but for the unusual strain would have held out for a considerable period."

A farm foreman experienced a severe pain on the right side of his body while performing his work. He was confined for some time, was released and returned to work receiving ambulatory treatment and apparently in good health. He twisted his leg when lifting a steel beam and experienced

much pain. He was taken to the doctor. He did not improve and a biopsy was performed and a cancerous condition was found in the kidney with metastasis on the leg. In challenging the compensation awarded to the laborer on the ground that the medical evidence was not sufficient and merely amounted to conjectures and possibilities, the Supreme Court of New Mexico in *White* v. *Valley Land Co.*, 322 P.2d 707 (1957), held that in labor compensation cases the verdict must rest on probabilities, particularly in labor accident cases in which the law must be liberally construed in favor of the worker. Although it is necessary to establish a causal relationship, such relation need not be shown by medical evidence. This testimony, though desirable, is not the only conclusive testimony. In applying the test of "sequence of events" it was held that the facts were sufficient to establish cause, and referring to cancer in particular it was said that since the cause thereof is unknown, there could never be a recovery if recovery were dependent upon a positive statement that trauma and the spread of cancer are connected.

In *Southern S.S. Co.* v. *Norton*, 41 F.Supp. 103 (1940), a laborer was injured on the dorso-lumbar region. He was hospitalized and given treatment, his health began to fail and he died from cancer of the lung. There was medical testimony to the effect that the cancer existed at the time of receiving the trauma and that it would have caused the death of the laborer just the same. In sustaining the compensation awarded to the widow, the court said that it was logical to infer that if the laborer had no cancer when he was injured, the trauma brought it about, and if he had it, the inference was that it aggravated it.

In *Boyd* v. *Young*, 246 S.W.2d 10 (1951), a laborer felt a sharp pain in his back when he lifted a box. He was referred for medical treatment, was operated on and it was found that he had cancer on the base of the neck. It was alleged that the trauma had accelerated the cancerous con-

dition. The Supreme Court of Tennessee said that the determinative issue was not whether the patient would have died sooner or later from his prior cancerous condition. It held that the case was compensable as a labor accident and that the accident aggravated or accelerated that condition. When the inference is that the accident contributes to the death, it is compensable even though the laborer was suffering from a serious disease. In this case significance was attached to the fact that the cancer existed in the same site where he received the trauma.

In *Branson* v. *Firemen's Retirement Fund*, 321 P.2d 1037 (1957), in which a laborer injured his knee and six years later it was found that he had cancer in the same site and died six months later, and in which the Industrial Commission denied recovery, the Supreme Court of Idaho in reversing the ruling found that there was causation in the fact that the tumor developed in the same site of the injury.

A laborer sprained his back when lifting a steel plate. His condition grew worse and the examinations disclosed a cancerous tumor on the right side of his back. In sustaining compensation, the Supreme Court of Illinois in *Ralph H. Simpson Co.* v. *Industrial Commission*, 169 N.E. 225 (1929), said that prior to the accident the laborer was strong and vigorous, that he was never well after that, and upheld the compensation as a labor accident whether the cancer existed prior to the accident and was aggravated by the injury, or whether the accident caused the cancer.

And in *Pixley* v. *Employers' Mutual Liability Ins. Co.*, 102 So.2d 113 (1959), the Court of Appeals of Louisiana awarded compensation to a laborer who received a blow on her chest while performing functions unrelated to her employment, with the knowledge of her employer, and it was afterwards found that she had a cancerous tumor on the right breast. Compensation was awarded on the basis of aggravation of the pre-existing cancerous condition. In affirming the

judgment, notwithstanding the medical testimony aimed at establishing that the blow did not aggravate her cancerous condition because the tumor was well developed, the court said as respects the medical testimony that the doctors themselves are in disagreement and that the causes of cancer and the relation of the trauma in the development of a cancerous condition are not known, and that the medical testimony should be appraised taking that fact into consideration. It was stressed that prior to the trauma she enjoyed good health, worked every day and had no symptoms of disease, and that after sustaining the trauma in the cancerous region her physical condition began to deteriorate. See *Shaw* v. *Owl,* 40 P.2d 588 (1935); *Lee* v. *Blessing,* 41 A.2d 337 (1945); *United States Fidelity* v. *Youngmans,* 176 S.E. 808 (1943); *Miami Coal Co.* v. *Luce,* 131 N.E. 824 (1921); and *Tatman* v. *Provincial Homes,* 382 P.2d 573 (1963). So far some illustrative decisions.

■■ With the preceding norms and well-accepted judicial decisions as guide, we need not decide affirmatively in the case at bar distinct from the medical opinion, nor did respondent Commission need to do so, that the trauma sustained by appellant while cutting cane initiated or was the causal factor of the skin cancer on his hand which incapacitated him within a short time. On the basis of Dr. Hazim's testimony, there is no reason why we should not accept the fact that appellant could have had a neoplastic condition in the site of the injury, whether such cancerous condition had developed, as the Fund sought to prove, or whether it was not noticeable or difficult to appreciate at first glance, as petitioner's evidence sought to establish to the effect that he was not suffering from that hand. But following the logical and realistic norm of "the sequence of events" frequently applied in these situations, the evidence as a whole leads to the fact and permits of a rational conclusion that it was probable

that the trauma aggravated that neoplastic condition, hastened its development and accelerated the metastatic process which precipitated the disability by the malignant cells which eked their way to the axilla, resulting in the amputation. The medical evidence in the record permits of a conclusion that there is something more than a mere probability.[5]

---

[5] Horovitz, the untiring student of this subject of labor accident compensation, in his recent revision of the subject in *"Workmen's Compensation: Half Century of Judicial Developments,"* published in 41 Neb. L. Rev. 1, says at p. 42:

"One of the misunderstandings between doctors and courts relates to causal relation, (hence 'out of') between work or working conditions and diseases of obscure origin. The medical profession takes the attitude that, if they as doctors do not know the 'cause' of a specific disease, the courts cannot uphold awards made by workmen's compensation administrators.

"The answer is twofold: (1) The precipitation, aggravation or acceleration of a disease by an injury at work, or by the work itself, is as compensable as original causation of the disease. Medical etiology, or knowledge of what germ or virus was medically responsible, does not interest an appellate court. (2) The question before the appellate court is not whether, on the evidence below, the judges would have found causal relation, or whether in fact the disease of obscure origin originated in the work or work-injury. Courts do not decide the truth or falsity of medical questions. They decide only whether, on the evidence before the administrator, it was 'rationally possible' or a 'reasonable conclusion' for him to decide that there was such causal connection, precipitation, aggravation or acceleration. On appeal, meager or slight evidence is sufficient.

"On this reasoning the modern courts properly have upheld awards involving cancer, heart disease, multiple sclerosis, meningitis, encephalitis, leukemia, traumatic epilepsy and arthritis.

".     .     .     .     .     .     .     .

"The early courts required medical evidence to support awards which involved medical questions. Today the overwhelming majority of courts uphold awards where there is not a single shred of medical evidence, or where the favorable medical evidence is weak but where the sequence of events is convincing. So, too, courts affirm awards where common sense, experience or knowledge point to a relationship which justifies the administrator's award—for example, death as the termination of serious injuries, or aggravation of hernia from lifting and straining. Thus, where there was a blow to a female employee's breast and the breast was subsequently removed and neither side offered medical evidence, the administrator concluded that there was causal relation. The 'sequence of events' was convincing and the appellate court upheld the award. The court stated that although medical evidence would have been helpful the conclusion of causal relation was justified.

If, as stated by Dr. Hazim, the cancerous condition dated back to a period prior to the day the trauma was sustained and yet apparently it was not perceptible and the laborer was working and had no impairment to his hand to prevent him from working, or that it became so painful that he could not stand it, and if, as stated also by Dr. Hazim, the growth of skin cancer is very slow and rarely produces metastasis, it is not difficult to conclude that the trauma had the effect of changing a cancerous process which otherwise would have been very slow and imperceptible and without producing aggravating metastasis. In any event, taking as a whole all the facts and circumstances in the record it cannot be concluded, in consonance with the remedial spirit in which these type of cases must be decided, that the record discloses an absolute and clear nonexistence of causation between the laborer's trauma and the aggravation or acceleration of the cancerous ulcer or the spread of metastasis which rarely occurs in this type of tumor. The record shows that petitioner, aged 60, had been married 40 years, maintained a home with 12 children, eight of whom were living at the time of his disability.

■ ■ Having reached the preceding conclusions on the basis of the facts, the legislative mandate of § 2 added to the Act in 1957 compels us as well as the administrative agencies, the State Insurance Fund and the Industrial Commission, to give the laborer the benefit of any reasonable doubt as to the existence of causal connection between his work and his disability. We already had occasion to state the extent of that legislative norm in the cases of *Feliciano* and *Meléndez*, *supra*. This norm, which codifies in a great part the general

---

"Even where medical evidence is offered by either side it may be disbelieved, in whole or in part. And the majority of courts no longer pay homage to the magic words 'probable' as opposed to 'possible.' If reading the record as a whole leads the appellate court to feel that the conclusions reached below are rationally possible on the evidence or on the inferences from the evidence, the award will be affirmed."

judicial expression, is wise. The objectives and purposes of this social legislation for the protection of the laborer would be defeated frequently if a worker, with the limitations inherent in his condition of litigant, without having easily available the technical means to do so in a majority of situations, were compelled to prove with scientific certainty the medical cause of disability or of death, in an area of activity in which medical science itself many times could not determine it either with accuracy. It has not been the purpose of the lawmaker that the right of a laborer to have protection against labor accidents be diluted in the turmoil of discussion, conjecture or even scientific speculation on etiological causes, in which there may be unknown factors, divergent criteria or theories which may be accepted or repudiated today but not tomorrow. The legislative norm means that if in the application of the law the facts, circumstances and all elements of judgment, among them "the sequence of events" and common sense, the record fails to show convincingly and without room for doubt that there is no causal connection between the laborer's *work* and his *disability* or *death*, the result would be a state of reasonable doubt to warrant compensation.

■ It must be borne in mind that these problems in which a social interest is involved in addition to those of the parties should be treated, on the administrative as well as on the judicial level, with such a degree of objectivity and realism as will accomplish the humanitarian purposes of the legislation. The price of this social interest should be absorbed by the community, either as direct taxpaying enterprise to the social fund which under the most recent legislation contributes in a greater scale within the all-embracing concept of employer, or as indirect taxpayer, to the cost of the product which it pays as consumer. The burden of the disability or death should not devolve upon the laborer or his dependents only.

The Fund has submitted this case on a brief memorandum invoking our ruling in *Salazar* v. *Indus. Comm.*; *Mgr. State Fund, Int.*, 76 P.R.R. 102 (1954). This ruling does not decide the case at bar nor apply to it. In *Salazar* it was held that a labor accident had not occurred as a result of exposure to X rays, and compensation was denied on the ground that cancer is not included among compensable occupational diseases.[6] In the instant case, unlike *Salazar*, we have held that there occurred a labor accident and the decision is not based on the provisions of the Act relative to compensation for occupational diseases.

For the reasons stated, the decision of the Industrial Commission of November 1, 1962 denying compensation is set aside and petitioner's incapacity is declared compensable, and the record shall be remanded for further proceedings consistent with the holding herein.

---

[6] Subsequent to *Salazar*, decided in 1954, Act No. 94 of June 22, 1957 (Sess. Laws, p. 439) included cancer among occupational diseases, including exposure to X rays. See *Hernández Nieves* v. *Industrial Commission, ante*, p. 334.